[No. 4071–II.   Division Two.   April 20, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. DENNIS TURNER, *Appellant.*

*William G. Knudsen,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* for respondent.

PETRICH, J.—Dennis Turner appeals from his conviction of three counts of second degree assault and one count of reckless endangerment, arising out of a series of Halloween shooting incidents. We affirm.

On October 31, 1978, the Kitsap County Sheriff's Office received reports of a sniper. Two vehicles passing a duplex complex on Rose Road, Port Orchard, where Turner

resided with his wife and children, had been struck by what officers believed to be small caliber bullets. The first vehicle fired on was driven by a stranger to the neighborhood, who was looking for the house of a friend. He continued around the block to Cedar Road where, at 9:44 p.m., he called the sheriff's department to report the shooting. Officers were dispatched to Cedar Road immediately and arrived at 10:07 p.m. A few minutes later, the officers heard a volley of shots being fired from the vicinity of Rose Road. When they proceeded to Rose Road to investigate, they found a 1964 El Camino stopped in the middle of the street, with two bullet holes in the body and one through the rear window. The vehicle had been occupied by three teenagers including Kenneth Straight, who was the driver and a former resident of the neighborhood. While inspecting the damage done to the Straight vehicle, the officers received a call regarding a house also on Rose Road having been fired upon. One bullet had passed through a window of that house located across the street from the duplex complex, and narrowly missed an occupant before it struck a wall. That bullet was retrieved and determined to be a .22 caliber in size.

While inspecting the duplex complex premises on Rose Road with several other officers who had been called in following the second volley of shots, the investigating officers found a number of .22 caliber shell casings a few feet from the middle of three duplexes. The Turner family resided in the most westerly of the duplexes, and were the only occupants of the complex.

Turner approached the officers as they examined the shell casings and demanded to know what they were doing. Appearing very excited, he admitted that he owned a .22 caliber rifle and initially volunteered to let the officers examine it. He changed his mind, however, when an officer told him that a .22 caliber had probably been used in the

shooting incidents.[1] He told them to get a warrant, and then ordered them to leave.

During his initial encounter with the officers outside the duplexes, at which time he had not yet been named as a suspect, defendant revealed that his house had been "egged." In reference to the egg throwing incident, he specifically mentioned Kenneth Straight.[2]

On November 2, at approximately 10:30 a.m., two officers with a search warrant, but no arrest warrant, visited the Turner residence. The search warrant affiant, who was the primary investigating officer on the night of the shooting incidents, told at least one of the arresting officers of the sequence of events which had occurred on the night in question, described the bullet trajectories, and also told the officer of Turner's previous problems involving Straight.

After identifying themselves and informing Turner they were investigating the shooting incidents, the officers were invited into the living room. They did not immediately tell Turner they had a search warrant because they hoped to obtain his "cooperation." They ended up arresting Turner, and executing the search warrant after he had been placed in the squad car. The arresting officer testified that defendant would have been arrested eventually, but that his "excited" behavior contributed to the arrest at that particular time. Turner had also spontaneously begun to tell the officers that he had recently test–fired his rifle because he knew that a police ballistics test would enable them to

---

[1]Officers in the area investigating the first shooting had heard shots being fired in rapid succession from what sounded like a small caliber weapon. Turner's rifle is a .22 caliber semiautomatic.

[2]Straight later admitted that he had driven to the neighborhood with two teenage friends to do some "harassing." He had two dozen eggs in his possession at the time and intended to "egg" Turner's residence. He and his companions had driven by the brightly lighted duplex complex a few times, just before their truck was fired upon, but assertedly decided to abort their plans after they observed police questioning the driver of the first vehicle, the rear window of which had been shattered. At trial, a few of Straight's friends who still resided in the neighborhood, admitted that they had independently undertaken the mission of "egging" Turner's residence.

determine whether his rifle had been involved in the Halloween shooting incidents. Thinking that Turner was beginning to get into an area where advisement of his *Miranda* rights might be prudent, the officer decided to take him into custody for questioning. At the sheriff's office, after he had been read his rights, Turner gave an oral statement which was admitted at trial. In an attempt to exculpate himself, he repeated his earlier explanation that he had test–fired his rifle after the shooting incidents, because he thought the police would want to test the shell casings and seize the rifle. He also stated that he had altered the firing pin, but gave inconsistent responses as to when the alteration occurred.[3]

Testimony established that during a separate incident instigated by Straight in May 1978, Turner had pointed his rifle at Straight; and threatened to shoot him if he did not leave the premises. There was also testimony that Turner had asked an officer in February 1978 a hypothetical question regarding the use of firearms in defense of his property. Defendant's custodial statement that he had bought a .22 rather than a shotgun because it would not "hurt as bad," was also admitted into evidence.

The jury found Turner guilty of three counts of second degree assault involving Straight and his two companions, and not guilty of the fourth count involving the other vehicle. It also found him guilty of reckless endangerment regarding the bullet which entered the home of his neighbor. In addition, the jury returned special verdicts finding that defendant had been in possession of a firearm and a deadly weapon, pursuant to the respective penalty enhancement provisions of RCW 9.41.025 and RCW 9.95-.040. Defendant appeals from the verdict and sentence.

On appeal, the first issue we address is whether defend-

---

[3] Within his in–custody statement defendant cryptically asserted that he had altered the firing pin "between now and then." In contrast, on his own behalf at trial he testified that during the July preceding the incident, he had altered the firing pin for identification purposes in the event the rifle were to be stolen.

ant's inculpatory statements regarding the test–firing of his weapon and alteration of the firing pin should have been suppressed as the poisoned fruit of an unlawful arrest.

In the usual case a warrantless arrest is legal if the arresting officer has probable cause to believe defendant has committed a felony. RCW 10.31.100. *See also State v. Todd,* 78 Wn.2d 362, 365, 474 P.2d 542 (1970); *State v. Turpin,* 25 Wn. App. 493, 497–98, 607 P.2d 885 (1980). Probable cause exists where the facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been committed. *State v. Fricks,* 91 Wn.2d 391, 398, 588 P.2d 1328 (1979).

The arresting officer knew that Turner possessed a .22 caliber weapon. From the proximity of the shell casings to the Turner residence, diagrams of probable bullet trajectories, and other information, the arresting officer had reason to believe that the shots had been fired from nearby defendant's home. Defendant and his family were the only persons residing in that particular location. The arresting officer knew that moments after the second volley had been fired Turner had been encountered outside by the search warrant affiant, and was assertedly waiting for a Halloween prankster to "get him." He also knew of defendant's past neighborhood quarrels, including the prior rifle–pointing incident involving Kenneth Straight. His curiosity was also aroused by defendant's statement that he had test–fired his rifle the day after the shooting incidents. Accordingly, we hold that there was ample probable cause for the warrantless arrest of defendant.

Defendant contends, however, that absent exigent circumstances,[4] a warrantless arrest within a dwelling is per se unlawful. We do not agree. Where officers are lawfully in a private home pursuant to a search warrant, they may

---

[4]Because of the manner in which we decide this case, we need not determine whether exigent circumstances supported the warrantless at–home arrest.

make a warrantless probable cause arrest even though there are no exigent circumstances. *State v. Williams,* 17 Wn. App. 186, 192, 562 P.2d 651 (1977), *aff'd,* 90 Wn.2d 245, 580 P.2d 635 (1978) (without reaching warrantless arrest issue).[5] Here, although defendant may properly assert that entry was not made *pursuant* to the search warrant, for the warrant was not served until after his arrest,

> when an officer has sought and obtained a magistrate's disinterested determination that a suspect's *right of privacy* must reasonably yield to a law officer's need to search in a private home, it would be unreasonable to require either an arrest warrant or a showing of exigent circumstances to justify a warrantless arrest upon probable cause.

(Italics ours.) 17 Wn. App. at 192–93. Since a neutral and detached magistrate had already determined that there was probable cause to conduct a search of defendant's dwelling, the arrest of Turner in his home did not constitute a significantly greater intrusion upon his privacy merely because an arrest warrant had not first been obtained. The fact that Turner invited the officers into his home further negates any assertion that the warrantless arrest in his home constituted an invasion of privacy.[6] *See State v. Teuber,* 19 Wn. App. 651, 654–55, 577 P.2d 147 (1978) (defendant in misdemeanor case waived right to privacy by inviting arresting officers into home).

Because (1) there was probable cause for the arrest, (2) a warrant had already issued for the search of defendant's

---

[5]Defendant argues that the holding of *Williams* is erroneous because of the court's reliance on *United States v. Watson,* 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976) (warrantless probable cause arrest in a *public* place lawful even absent exigent circumstances where specific act of Congress authorized postal inspectors to make such arrests). Since the Supreme Court's decision in *Watson* turned more on fulfillment of the constitutional requirement of probable cause than on legislative authorization to arrest without a warrant, we decline to accept defendant's invitation to depart from the holding of *Williams.*

[6]Because the arresting officers entered defendant's home with the consent of the occupant, *Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), does not invalidate the arrest.

dwelling, and (3) defendant invited the officers into his home, we hold that Turner's warrantless at–home arrest was lawful and consequently, that his voluntary in–custody statements were properly admitted at trial.

We next address the question of whether the trial court abused its discretion in admitting evidence of defendant's prior rifle–pointing incident involving Kenneth Straight, and of his previous hypothetical question to a police officer regarding the lawfulness of using firearms to protect his property.

Although evidence of other crimes, wrongs, or acts is not admissible to prove character or that a person acted in conformity therewith, it may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ER 404(b). This list of exceptions is not exclusive, the true test being whether the evidence as to other acts is relevant and necessary to prove an essential ingredient of the crime charged. *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952); *State v. Irving,* 24 Wn. App. 370, 601 P.2d 954 (1979). Relevant evidence is generally admissible, ER 402, but may be excluded if its probative value is substantially outweighed by the danger of prejudice. ER 403. Where admission of evidence of prior bad acts is unduly prejudicial, the minute peg of relevancy is said to be obscured by the dirty linen hung upon it. *See* Stone, *The Rule of Exclusion of Similar Fact Evidence: England,* 46 Harv. L. Rev. 954, 983 (1933). Relevant evidence is evidence having *any* tendency to make the existence of any fact that is of consequence to determination of the action more or less probable than it would be without the evidence. ER 401; *cf. State v. Ranicke,* 3 Wn. App. 892, 479 P.2d 135 (1970). The determination of whether testimony is relevant is within the discretion of the trial court, *State v. Bonner,* 21 Wn. App. 783, 793, 587 P.2d 580 (1978), and each case depends on its own facts. 3 Wn. App. at 895.

Applying these principles to the present case, it does not appear that the trial court abused its discretion. Testimony

showed that Straight's 1964 El Camino, which was nearly identical to the one he had owned while he was a neighbor of the Turner family, had made repeated, slow trips past the Turner duplex immediately before it was fired upon. Straight had gone to the neighborhood with the purpose of throwing eggs at the Turner residence, and eggs had in fact been thrown at it before the shootings, although assertedly by friends of Straight acting on their own. Because defendant's prior hypothetical question regarding the firing of warning shots in defense of his property indicated a frame of mind relevant to proof of intent in the present case, and the prior incident involving Straight was probative of motive, testimony regarding both incidents was proper. Although under different circumstances defendant might be correct in asserting that evidence of his prior conduct was introduced to indicate a propensity to improperly utilize firearms in the course of defending his property, under the facts of this case we hold that the prior incidents were relevant and necessary to prove the essential ingredients of the offense.

■ The next issue we must decide is whether defendant's conviction is supported by substantial evidence. There is substantial evidence to support a conviction when, viewing the evidence most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980). In considering the evidence, the reviewing court must assume the truth of the State's evidence and view it most strongly against defendant, allowing the State the benefit of all reasonable inferences. *State v. Braxton,* 10 Wn. App. 1, 516 P.2d 771 (1973). Circumstantial evidence is as trustworthy as direct evidence. *State v. Gosby,* 85 Wn.2d 758, 766, 539 P.2d 680 (1975). After careful review of the record, we conclude that the evidence in support of defendant's conviction, albeit circumstantial, was substantial.

The final issue on review is whether application of both the firearm statute, RCW 9.41.025, and deadly weapon

statute, RCW 9.95.040, to limit sentencing discretion of the trial judge and parole board constituted double jeopardy. We respond in the negative.

Either successive prosecutions or multiple punishments for the same offense may constitute double jeopardy. *See, e.g., State v. Cunningham,* 23 Wn. App. 826, 859, 598 P.2d 756 (1979); *State v. Bresolin,* 13 Wn. App. 386, 393, 534 P.2d 1394 (1975). Here, the statutorily proscribed acts of being "armed with a deadly weapon" and "in possession of a firearm" clearly constitute the "same offense." *See State v. Roybal,* 82 Wn.2d 577, 581–82, 512 P.2d 718 (1973) (if evidence required to support a conviction on one charge sufficient to warrant conviction on the other, they are the "same offense" for double jeopardy purposes); *State v. Whittington,* 27 Wn. App. 422, 425, 618 P.2d 121 (1980).

Although here the firearm and deadly weapon statutes cover the same offense, Turner is not the object of "multiple punishment." Application of both enhancement statutes did not increase the maximum sentence for second degree assault. It merely limited the sentencing discretion of the trial court and parole board in such a way that neither entity may favor defendant with a prison term shorter than 5 years. In our view, definite punishment is not tantamount to double punishment.

None of the cases defendant cites support his double jeopardy theory.[7] In particular, we disagree with defendant's reliance on *Simpson v. United States,* 435 U.S. 6, 55

---

[7]Although *State v. Frazier,* 81 Wn.2d 628, 503 P.2d 1073 (1972) indicates that a specific distinction must be made between a deadly weapon under RCW 9.95-.040 and a firearm under RCW 9.41.025, its holding is merely that a defendant may not be sentenced under RCW 9.41.025(1) where defendant was not given notice in the information that this statute would apply, and where no special finding appropriate to this statute was returned by jury verdict. Here, defendant was given ample notice in the information that both enhancement statutes might apply. In addition, the jury verdict returned special findings appropriate to both statutes.

Defendant's reliance on *State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978) is also misplaced. There, the court held that it was improper to enhance the penalty for first degree robbery under RCW 9.41.025 because (1) possession of a deadly weapon is an element of the crime, and (2) penalty enhancement is already

L. Ed. 2d 70, 98 S. Ct. 909 (1978), which has been applied in *State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978) and *State v. Stephens,* 22 Wn. App. 548, 591 P.2d 827 (1979). That case is inapplicable to the case at bench because (1) its resolution did not rest on double jeopardy principles, (2) it involved the imposition of additional cumulative sentences, and (3) the enhancement statutes were directed only at the discretion of a single sentencing entity. In the present case, the applicable enhancement statutes, in effect, provide for concurrent, rather than consecutive minimum terms, and limit the sentencing discretion of both the trial court and parole board. Accordingly, we hold that application of both the firearm statute and deadly weapon statute to enhance defendant's sentence did not result in his being twice placed in jeopardy for the same offense.

Since we are unable to concur in any of defendant's numerous assignments of error, his convictions and sentence are affirmed.

PEARSON, A.C.J., and PETRIE, J., concur.

Reconsideration denied May 27, 1981.

Review denied by Supreme Court July 17, 1981.

---

incorporated in the punishment for first degree robbery. Neither rationale applies here.