[No. 15891–1–I.   Division One.   March 2, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. JEFFREY
LEE THOMPSON, *Appellant.*

*Jeffrey Lee Thompson,* pro se, *Helen A. Anderson* of *Washington Appellate Defender Association, Paris K. Kallas,* and *Wolfe, Lobsenz & Cullen,* for appellant.

*Norm Maleng, Prosecuting Attorney, Peter Goldman, Special Deputy,* and *Fred Yeatts, Deputy,* for respondent.

SCHOLFIELD, C.J.—Jeffrey Lee Thompson appeals his convictions for manslaughter in the first degree and assault in the second degree.

## STATEMENT OF FACTS

Thompson, a/k/a Christopher Stroud Cole, was charged with the murder in the second degree of Calvin Knoth and assault in the first degree while armed with a deadly weapon upon Roger Dapping, committed on February 20, 1981. Thompson's initial trial resulted in a conviction of the lesser included crimes of first degree manslaughter and second degree assault.

The circumstances giving rise to the charges are as follows: Thompson and two friends, Richard Duskin and Bob Russell, were together in the First Edition tavern, near North 85th Street and Greenwood Avenue North. Thompson testified that he decided to carry his handgun because he was somewhat incapacitated from a fall from a third–

story roof 2 years earlier.

While Thompson and his friends were in the First Edition, a group of four—Roger Dapping, Calvin Knoth (the two victims here), and their two women friends—came in. Apparently Russell made some remark about the two women to the effect of "nice ladies." Dapping then spent some time staring in an intimidating manner in the direction of Thompson and his companions. Thompson and his companions left the First Edition and headed for the Roundup Tavern nearby, on foot. They were accompanied by a woman friend and her two male companions.

Dapping's and Knoth's group stayed at the First Edition, and eventually pulled out a baggie of marijuana. Upon observing this, the bartender informed them that they could not smoke marijuana inside so they went out behind the tavern to smoke.

Meanwhile, Thompson's group returned to the First Edition parking lot. Duskin parted from the group to use the restroom. Russell got into a discussion with Dapping and Knoth about Russell's earlier remarks, and Thompson testified he then tried to extricate his friend from the fight.

Thompson testified that someone or something hit him on the head. He believed it was either Dapping or Knoth. Then Dapping told Thompson that he was not going anywhere until Dapping was through with him, threatening to break his leg after Thompson mentioned his injuries. Thompson then observed Dapping digging in his pocket, so he pulled out his own handgun.

According to Russell, Dapping told Thompson he was not afraid of a cap gun. Thompson testified that he then started backing up and as Duskin came from the tavern, he told Duskin to start the car. However, Duskin said he did not want to get involved and ran off.

Thompson testified that he had backed far enough to be able to turn toward the car, and then he heard something behind him and turned to see Knoth advancing toward him. Thompson thought he saw a knife, so he shot Knoth. Dapping lunged at Thompson, who shot Dapping several

times, but Dapping kept coming and the two engaged in a wrestling match. Thompson managed to push Dapping from him and run away, but he was apprehended that same evening. Knoth died from his wounds, and Dapping underwent surgery and was hospitalized for his injuries.

Dapping's version of the events was that Russell approached the group asking for marijuana and that, without a word to anyone, Thompson pulled out the gun. Thompson shot Knoth, and Dapping ran toward Thompson to make him stop shooting, but was also shot by Thompson. Dapping testified that he made no threats to anyone during the altercation. On cross examination, Dapping remembered that he and Russell "might have" had conversation regarding Russell's earlier remarks about the women. Throughout the trial, frequent references were made about the fact that all parties had consumed considerable amounts of alcohol.

Kirk Moore testified that as he was waiting for a bus near 85th and Greenwood, he observed three males leave the First Edition, and one of them was yelling, "I'm going to kill the bastard" and brandishing a gun. Moore indicated that Thompson was that person.

Jim Coyne testified that he and a friend, Jim Langton, were in Coyne's truck traveling on North 85th, when they observed a fight in which one person was being attacked by the other three. Langton rolled down his window and suggested that they should "make a fair fight out of it." One of the four pointed a gun at the truck and said he did not like the remark, and so Coyne drove away. Langton identified Thompson as the person who pulled the gun. Both of these instances testified to took place in the hour just prior to the death and injury of Knoth and Dapping.

The trial court denied defense counsel's request for a "no duty to retreat" instruction. The defense took exception to instruction 26, which defined "necessary" as it related to use of force. Defense counsel also sought to have the court delete the aggressor/provoker instruction, but this request was denied. Although defense counsel sought an instruction

on the definition of "knowledge" as an element in the assault charge, he did not take exception that it was not given.

The jury found Thompson guilty of manslaughter in the first degree and assault in the second degree while armed with a deadly weapon, a firearm. Thompson was sentenced to 10 years on each count, to be served consecutively.

## "No Duty To Retreat" Instruction

Instructions are sufficient if they state the law correctly, are not misleading and allow the parties to argue their theories of the case. *State v. Mark,* 94 Wn.2d 520, 618 P.2d 73 (1980).

The defendant's proposed "no duty to retreat" instruction read as follows:

> One who is where he has a lawful right to be is under no obligation to retreat when attacked. He may stand his ground and defend himself from such attack, and in doing so he may use all force and means that would appear to a reasonable person in the same situation to be necessary to prevent the attack.

The court refused the "no duty to retreat" instruction, but gave the following instruction concerning necessary force:

> Necessary means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended, under the circumstances as they reasonably appeared to the actor at the time.

Instruction 26.

Thompson argues that he was entitled to a "no duty to retreat" instruction because sufficient evidence to support the instruction was presented by his testimony. Thompson further contends that the instruction which defined "necessary use of force" aggravated the problem because it suggested a duty to retreat.

▮ We find here that Thompson was able to argue his theory of the case without the instruction. The question of whether Thompson should have retreated was not an issue raised by either side at trial. In *State v. Allery,* 101 Wn.2d

591, 682 P.2d 312 (1984), the defendant's theory of the case concerned the "battered woman syndrome" to explain why Allery felt compelled to shoot her husband, despite the reality that he had not moved from the couch where she first found him. *Allery,* at 595. The "no duty to retreat" instruction was central to Allery's theory of the case. Here, because the defense theory was that Thompson was actively retreating, a "no duty to retreat" instruction would have been superfluous. It was not error to refuse the "no duty to retreat" instruction.

Additionally, Thompson argues that instruction 26 could be construed as suggesting to the jury that he had a duty to retreat. In *State v. Lewis,* 6 Wn. App. 38, 491 P.2d 1062 (1971), the defendant claimed self–defense in the stabbing death of the victim. The trial court instructed the jury as follows:

> In connection with the defense of justification, you are instructed that you may consider the words and actions of the deceased prior to the homicide, the relative size and strength of the persons involved, *the availability to defendant of a means of escape from danger,* if any, and all other factors which in your judgment may bear upon your determination as to whether the defendant reasonably believed herself in danger of grievous bodily harm at the time in question.

*Lewis,* at 40. On appeal, the court found that is was error to instruct the jury that it should consider the availability of escape because the instruction unduly emphasized the circumstance of escape. *Lewis,* at 42.

Unlike the instruction in *Lewis,* instruction 26 in the trial below did not specifically single out escape or retreat as an alternative to be considered by the jury. The jury could reasonably have considered other alternatives, such as talking to the victims or using fists instead of a gun. We find that the giving of instruction 26 was not error.

## AGGRESSOR/PROVOKER INSTRUCTION

Thompson contends that no evidence was submitted to support the giving of the aggressor/provoker instruction.

Further, Thompson argues that the aggressor/provoker instruction is void for vagueness, and was an impermissible comment on the evidence. We disagree.

The trial court gave instruction 15, which reads in pertinent part:

> No person may by any unlawful act create a necessity for acting in self–defense or defense of another and thereupon kill[,] use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self–defense or defense of another is not available as a defense.

This instruction is included in the Washington Pattern Jury Instructions as WPIC 16.04.

Each party at trial is entitled to have the trial court instruct upon its theory of the case if there is sufficient evidence to support the theory. *State v. Theroff*, 95 Wn.2d 385, 622 P.2d 1240 (1980). However, it is prejudicial error to submit an issue to the jury where there is not sufficient evidence to support it. *State v. Heath*, 35 Wn. App. 269, 666 P.2d 922 (1983).

The State's evidence tended to show that although neither Knoth nor Dapping said anything to Thompson, Thompson made the first move by drawing his gun on them. Although this evidence was disputed by Thompson's and Russell's testimony, the evidence presented by the State was sufficient to allow the instruction to be given.

Thompson argues that because the instruction refers to an unlawful act, it is void for vagueness. In *State v. Arthur*, 42 Wn. App. 120, 708 P.2d 1230 (1985), a defendant was prosecuted for second degree assault with a deadly weapon. A similar aggressor/provoker instruction was given. The *Arthur* court stated that the problem with the instruction was that determination of whether there was an "unlawful act" required speculation and conjecture as to which act of the defendant might have been characterized by the jury as unlawful. *Arthur*, at 122. In *Arthur*, the court found that

the only act which could be considered as provoking or precipitating the confrontation would have been an accidental collision with the victim's car. The jury might have found such a collision as unlawful because it constituted reckless or negligent driving. The *Arthur* court held that the instruction was too vague and too broad because it might include accidental conduct and stated that an aggressor instruction must be directed to intentional acts, which the jury could reasonably assume would provoke a belligerent response by the victim. *Arthur,* at 125. *See also State v. Hardy,* 44 Wn. App. 477, 722 P.2d 872 (1986).

In *State v. Hughes,* 106 Wn.2d 176, 721 P.2d 902 (1986), the defendant shot two police officers while resisting arrest for another murder. At his trial for aggravated first degree murder, the trial court instructed the jury with the aggressor/provoker instruction, WPIC 16.04, based on the theory that the defendant shot first. On appeal, the Washington Supreme Court upheld the giving of the instruction, stating that:

> While [the specific acts of aggression] were not specified in instruction 33 [WPIC 16.04], the evidence of unlawful conduct was clear.

*Hughes,* at 193.

Similarly, in the case at bar, Thompson's unlawful conduct, consisting of drawing his weapon, was the only conduct upon which the jury could base a denial of his self–defense theory. Therefore, although we have stated before and reiterate that WPIC 16.04 as written is vague and overbroad unless directed to specific unlawful intentional conduct, we find any error here to be harmless.

Thompson also argues that the giving of the aggressor/provoker instruction was an impermissible comment on the evidence. The Washington Constitution, article 4, section 16, prohibits a judge from conveying to the jury his or her personal belief in the merits of a cause. *See also State v. Theroff, supra.* However, an instruction does not constitute an impermissible comment on the evidence when there is sufficient evidence to support it and when the instruction

accurately states the law. *State v. Sampson,* 40 Wn. App. 594, 699 P.2d 1253, *review denied,* 104 Wn.2d 1005 (1985); *State v. Hughes, supra.* We find Thompson's contention to be without merit.

### DEFINITION OF KNOWLEDGE

Thompson argues that the trial court committed reversible error by failing to define one of the elements of assault, the element of knowledge, but concedes that he raises this issue for the first time on appeal. He argues that the error is constitutional in magnitude.

As a general rule, instructional defects must be brought to the attention of the trial court or they cannot be raised on appeal. However, an instructional error may be raised for the first time on appeal if it involves a constitutional right and would probably change the outcome of the case. *State v. Pam,* 98 Wn.2d 748, 659 P.2d 454 (1983).

Where the element of the crime is not commonly understood, failure to define it is constitutional error. *State v. Bledsoe,* 33 Wn. App. 720, 658 P.2d 674, *review denied,* 99 Wn.2d 1019 (1983); *State v. Davis,* 27 Wn. App. 498, 618 P.2d 1034 (1980).

The court in *State v. Allen,* 101 Wn.2d 355, 678 P.2d 798 (1984) found that statutorily defined mental states, such as knowledge and intent, have a technical meaning, and should be defined for the jury. The *Allen* court did not determine whether the failure to define the mental states is an error of constitutional magnitude because in that case the definition was requested by the defendant.

However, we need not decide that issue, because any error was harmless. In *State v. Boot,* 40 Wn. App. 215, 697 P.2d 1034 (1985), the defendant was prosecuted for first degree rape and second degree robbery. The defendant claimed that the trial court erred in not defining intent and theft.

The Court of Appeals noted the requirement in *Allen* to define technical terms like "knowledge" and "intent". However, the court went on to say that any error from fail-

ure to define "intent" and "theft"

> was harmless because these elements were not at issue in either charge [because the defendant's] defense was misidentification.

*Boot,* at 218.

RCW 9A.08.010(2) states that proof of a higher mental state also establishes the presence of all lower mental states. In *State v. Wheeler,* 95 Wn.2d 799, 631 P.2d 376 (1981), the court determined that because the jury must have found intentional conduct to have found assault in the second degree, it also found knowledge subsumed in intentional conduct. The court held, therefore, that the assault instructions in effect converted an erroneous knowledge instruction to harmless error. *Wheeler,* at 808.

Thompson conceded on cross examination that his conduct was intentional, and his theory of the case was not lack of knowledge, but self–defense. Therefore, because the mental element of knowledge was not in dispute in the case before the panel, and also because the jury, of necessity, found knowledge when it found intentional conduct constituting an assault, the trial court's failure to define knowledge was not reversible error.

## ER 404(b)

Thompson argues that the testimony given by Moore, Langton and Coyne was not relevant to any of the 404(b) purposes, such as identity, motive and intent, etc. Secondly, Thompson argues that the prejudicial effect of the testimony outweighed any probative value it might have had. We disagree.

Although character evidence is not generally admissible, ER 404(b) delineates the circumstances under which other crimes, wrongs, or acts may be admissible:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Prior Washington law is in accord. Prior bad acts will only be admissible if they are logically relevant to a material issue before the jury. *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952). Even if relevant, however, such evidence is inadmissible where prejudice outweighs probative value.

In *State v. Saltarelli,* 98 Wn.2d 358, 655 P.2d 697 (1982), the Washington Supreme Court stated that the trial court must first consider the relevance of prior bad acts by deciding whether the evidence makes the existence of any fact that is of consequence to the determination of the action more or less probable. *See* ER 402. If the evidence is relevant, then probative value must be balanced against prejudicial effect. *See* ER 403. The *Saltarelli* court noted:

> In no case, however, regardless of its relevance or probativeness, may the evidence be admitted to prove the character of the accused in order to show that he acted in conformity therewith.

*Saltarelli,* at 362.

The State here correctly argues that the testimony of Langton, Coyne and Moore is relevant because it tends to contradict Thompson's testimony that his acts of shooting were in self–defense, because it showed a continuing course of provocative conduct during the course of an evening.

In *State v. Turner,* 29 Wn. App. 282, 627 P.2d 1324 (1981), the defendant was convicted of three counts of second degree assault and one count of reckless endangerment arising out of a series of Halloween shooting incidents. The court of Appeals held that it was not error to admit evidence of prior rifle–pointing incidents to show frame of mind. *Turner,* at 290.

In *State v. Tharp,* 27 Wn. App. 198, 616 P.2d 693 (1980), *aff'd,* 96 Wn.2d 591, 637 P.2d 961 (1981), the defendant was charged with second degree felony murder. The trial court admitted evidence of a series of criminal events which culminated in the murder. The court held that the evidence of the three collateral crimes was admissible under the res gestae or same transaction analysis because its purpose was "'[t]o complete the story of the crime on trial by proving its

immediate context of happenings near in time and place.'
(Footnote omitted.)" *Tharp*, at 204 (quoting E. Cleary,
*McCormick on Evidence* § 190, at 448 (2d ed. 1972)). *See
also State v. Bockman*, 37 Wn. App. 474, 682 P.2d 925,
*review denied*, 102 Wn.2d 1002 (1984); 5 K. Tegland, Wash.
Prac. § 115 (1982).

Here, the testimony of the three witnesses was rele-
vant to show the absence of self–defense by showing a con-
tinuing course of provocative conduct. Additionally, the
testimony was relevant under the res gestae exception,
because this conduct took place in between the time
Thompson and his friends encountered Dapping and Knoth
and the time of the shootings.

Having determined that the testimony was relevant, the
trial court is required to balance prejudicial effect with
probative value. As the State correctly notes, this balancing
is a discretionary ruling. *Turner*, at 289. Where the decision
or order of the trial court is a matter of discretion, it will
not be disturbed on review except on a clear showing of
abuse of discretion, that is, discretion manifestly unreason-
able or exercised on untenable grounds or for untenable
reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26,
482 P.2d 775 (1971). We find no abuse of discretion here
and determine that the evidence was properly admissible.

### State's Alleged Failure To Disclose the Facts of the Custodial Status of Roger Dapping

Thompson contends that the prosecutor acted improp-
erly by not informing defense counsel that Roger Dapping
was in custody because of a possible parole violation. Fur-
ther, Thompson argues that the prosecutor allowed
Dapping to give false testimony by giving a home address
and place of regular employment, rather than mentioning
his custodial status. Thompson argues his right to confront
the State's witnesses was impaired by the State's failure to
disclose these facts.

The State argued at the motion for new trial that it only

found out about Dapping's custodial status the day before Dapping testified. The State argues that the information given by Dapping was technically correct and was not affected by his short custodial status (1 week). The State also stated by sworn affidavit that defense counsel was aware of Dapping's custodial status because counsel approached the prosecutor the day after Dapping testified (still during trial) and asked if Dapping was in custody, and the prosecutor replied affirmatively.

We find that the issue of Dapping's custodial status would not have been admissible because it had no impeachment value in and of itself under ER 609. *See State v. Alvarez*, 45 Wn. App. 407, 726 P.2d 43 (1986). In addition, we do not find that Dapping's living situation was materially misrepresented.[1]

### SENTENCING

Thompson argues in his pro se brief that, at the time of sentencing, he was not given credit for good time already served; he argues that only one of his two consecutive sentences could be enhanced for possession of a firearm because the two crimes were part of the same transaction; and he argues that the Legislature's intention to dismantle the parole board necessitates dismissal of this case because the effect of the discontinuation of the parole board is the enactment of an ex post facto law.

The issue of credit for good time served is within the purview of the Department of Corrections and the Board of Prison Terms and Paroles and cannot be reviewed by this court. With regard to the sentence enhancement, this issue

---

[1]While we acknowledge that no harmful error occurred through the State's failure to disclose Dapping's custodial status, we question the wisdom of the State's nondisclosure. CrR 4.7(3) and rule 3.8(d) of the Rules of Professional Conduct require the prosecutor to make timely disclosure to the defense of all evidence or information which tends to negate guilt or may mitigate the offense. While the custodial status of a witness for the State may technically fall outside these parameters, these rules and the public interest are best served by full and open disclosure of potentially relevant information.

was not raised below.[2] To preserve error for consideration on appeal, the alleged error must first be called to the trial court's attention to afford the court the opportunity to correct the error. *State v. Serr,* 35 Wn. App. 5, 664 P.2d 1301 (1983). Therefore, we decline to review the issue of the enhancements.

We find the contention that the discontinuation of the parole board violates the prohibition against ex post facto laws to be unsupported. The Washington Supreme Court addressed this issue in *Addleman v. Board of Prison Terms & Paroles,* 107 Wn.2d 503, 730 P.2d 1327 (1986). There the court first determined that abolition of the parole board *would* constitute an ex post facto law because it would remove the body that implements certain statutory mechanisms for shortening prison terms. However, the court held that legislative additions and amendments to RCW 9.95-.009(1), which redesignates the parole board as the indeterminate sentencing review board until 1992, and then provides for the transfer of its functions to the superior courts, cures any ex post facto problem. *Addleman,* at 506–07.

Judgment affirmed.

COLEMAN and WEBSTER, JJ., concur.

Review denied by Supreme Court May 5, 1987.

---

[2]At the sentencing hearing, defense counsel moved to dismiss the firearm allegations because a new information containing the firearm allegations and the new charges for the lesser included offenses was not issued following the remand for a new trial after the first appeal. He argued that his client had no notice of the firearm allegations. Because the allegations were contained in the original information, the motion to dismiss the allegations was denied. The issue raised on appeal by the defendant concerning the same transaction analysis is significantly different.