162 P.3d 1180 (2007)
STATE of Washington, Respondent,
v.
Jason Vincent POWELL, Appellant.
No. 34556-1-II.
Court of Appeals of Washington, Division 2.
July 24, 2007.
*1181 John A. Hays, Longview, WA, for Appellant.
Michael C. Kinnie, Vancouver, WA, for Respondent.
PENOYAR, J.
¶ 1 A jury found Jason Powell guilty of attempted first degree burglary while armed with a firearm. On appeal, Powell (1) challenges the sufficiency of the evidence, (2) faults defense counsel's failure to object to the admission of prejudicial hearsay, (3) challenges the admission of his drug use, and (4) challenges a community custody condition requiring him to undergo drug abuse treatment. In his statement of additional grounds (SAG), he challenges several jury *1182 instructions and claims a violation of his right to bear arms. We reverse and remand.

FACTS
¶ 2 Powell and Amber Williams had a relationship for three and one-half years. During that time, they had a son together. On October 12, 2005, Williams was living with her parents and Powell was living in an apartment in Portland, Oregon. He called her that night, but the call ended when she hung up the telephone and shut it off. Apparently, she told him that she did not think it would be a good time for him to be around their son.
¶ 3 About 7:30 the next morning, Williams was preparing herself and her children and for the day when she heard someone try to open the front door "really quietly." 1 Report of Proceedings (RP) at 51-52. Her son looked out the window, got a panicked look on his face, and said to her, "It's Jason." 1 RP at 53. He also said that Powell was going down the front stairs and around the back of the house.
¶ 4 Williams then went to the back sliding glass door, pulled the curtains shut, and stood there. When she then heard Powell trying to open the back door, she took her children to a back bedroom, locked the door, and called the police. She said that Powell never knocked, rang the doorbell, or called out. She did not understand why he was sneaking around but it concerned and scared her.
¶ 5 A short time later, she looked out the window and saw Powell being arrested. He was wearing a camouflage shirt, a black knit hat, black cut-offs, black socks, and black shoes. She had never seen Powell wear the shirt or shorts before and found them unusual. She later described him as an uninvited guest.
¶ 6 Williams testified that Powell often carried a gun; that he would play with it, which made her uncomfortable; and that he carried it to defend himself, but that he never had pointed it at her or anyone else in her presence. She said that her entire family was mad at Powell and that he was not welcome at their home, though she admitted that no one had told him this. She stated that the last time he had been there was on July 4, 2005, and he was on the front porch waiting when she arrived home. During that visit, while sitting with friends, Jason told her that if she ever tried to keep their son from him, he would kill her. She said he then cocked his gun and said that someone was going to die. When she responded that everyone dies eventually, he replied, "[s]ome sooner than others." 1 RP at 49.
¶ 7 Vancouver Police Officer James Watson responded to Williams's 911 call. As he drove past the front of the house, he saw Powell on the front porch. He later described what he saw: "Well, it appeared to me that he was actually trying to get in the door. He was facing the door, slightly bent over, and his right arm waslooked like he was working the mechanism." 1 RP at 92. When Officer Watson approached the house on foot, he called out to Powell. Powell's posture became very rigid and he turned and walked away without looking at the officer. Officer Watson asked Powell to stop three times but each time Powell kept walking. Officer Watson referred to this as "conspicuous ignoring." 1 RP at 94.
¶ 8 Officer Watson caught up to Powell and took his elbow. Powell jerked his arm away violently and exclaimed, "What the fuck are you doing?" 1 RP at 96. In the process of trying to control Powell, Powell's camouflage jacket came off and he tried to break free. While forcing Powell into handcuffs, dispatch informed Officer Watson that Powell had an outstanding warrant and a gun then fell from Powell's shorts. The gun was loaded and fully functional.
¶ 9 After Powell's arrest, Officer Watson approached a light blue Honda Accord with a young man at the wheel who appeared to have observed what had happened. The driver identified himself as William Andrew Pearson and told Officer Watson that he had given Powell a ride "to come and get his child." 1 RP at 102.
¶ 10 Earlier that morning, Gregory Kincaid went to Powell's residence. There he found Powell with Pearson. Powell was anxious and upset with Williams. Kincaid saw *1183 him take methamphetamine. When leaving, Powell told Kincaid that he was going over to Williams's house.
¶ 11 Powell was charged with attempted first degree burglary (domestic violence)[1] while armed with a firearm.[2]
¶ 12 Powell testified that he was at Williams's home that morning because he had left his bicycle there and needed to get it back. He explained that he tried to call Williams's cell phone and land line but no one answered. He said that he did not try to open the doors, that he looked in the window but did not see anyone, and that he knocked and rang the door bell. He also introduced his cell phone logs showing that he had placed two calls to Williams that morning. He explained that about two weeks prior, Williams had asked him to come get his bicycle because her parents did not want it in their garage. He described himself as fascinated with guns and explained that he carried a gun because it was his right.
¶ 13 During cross-examination, Powell acknowledged that he tried but failed to open the front door. He denied that he was ignoring Officer Watson, explaining that he was trying to make a telephone call and the noise of the school buses had his attention. He also admitted telling Williams that he would kill her if she kept their son away, but he explained that he did not really mean it. He also denied taking methamphetamine and denied being under its influence when he was at Williams's house.
¶ 14 Before trial, the State sought to introduce testimony that Powell was under the influence of methamphetamine. It explained: "And for the sole purpose of showing what his, as you said, mental state was at the time, I believe it's relevant into how the Defendant was acting and why he was upset." 1 RP at 38. The court admitted the evidence, reasoning:
This witness is willing to testify, as I understand it, that shortly before the Defendant went over to the residence of Ms. Williams, his mental state was somewhat incoherent, he apparently was acting in an unusual manner, and that he consumed a controlled substance just before he left.
The prohibitive [sic] value of that is pretty strong, in my opinion, because apparently, that's the issue that we have here, is whether he intended to commit some other crime. I don't  haven't heard any argument that its prejudicial effect is outweighed by its prohibitive [sic] value and I wouldn't find that it was in this point. So, I'm going to admit the testimony, as indicated by the witness.
1 RP at 40-41.
¶ 15 Powell wanted to present Pearson as a witness but he did not show up to testify. The trial court even set trial over until the next day but again Pearson did not appear. The defense then rested.
¶ 16 The jury found Powell guilty and by special verdict that he committed the offense while armed with a firearm. The court imposed a standard range sentence along with a 36-month firearm enhancement. As part of his community custody conditions, the court ordered Powell to complete substance abuse treatment.

ANALYSIS
I. SUFFICIENCY OF THE EVIDENCE
¶ 17 Powell first argues that the evidence was insufficient to prove he intended to commit a crime in Williams's residence. He claims that even if he went to take his son, and not his bicycle as he claimed, that is not a crime because Williams did not have a restraining order against him and he has equal rights to his child.
¶ 18 When facing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Green, 94 Wash.2d 216, 221, 616 P.2d 628 (1980). Because credibility determinations are for the trier of fact and are not subject to review, State v. Camarillo, 115 *1184 Wash.2d 60, 71, 794 P.2d 850 (1990), we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533 (1992).
¶ 19 The trial court defined first-degree burglary:
A person commits the crime of Burglary in the First Degree when he or she enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in the immediate flight therefrom, he or she is armed with a deadly weapon.
CP 57; Instr. 9. A person commits attempted first degree burglary when he takes a substantial step toward commission of first degree burglary.
¶ 20 Taking the evidence in a light most favorable to the State, a jury could find that Powell intended to commit an offense against Williams inside the residence. Given the surrounding circumstances, the jury was entitled to infer from the attempted unlawful entry that Powell intended to commit a crime. Williams testified that she was afraid of Powell, that he carried a gun, that he had threatened to kill her if she prevented him from seeing his son, and that she had hung up on him the previous night. She also testified that he was dressed in camouflage clothing, was trying to sneak undetected into her home, and that he was not welcome there. Further, Kincaid testified that Powell had just consumed methamphetamine, and Officer Watson testified that Pearson told him that Powell was there to get his son. The reasoning that Powell potentially had a lawful purpose to be at Williams's residence (visiting his son or retrieving his bicycle) did not prevent the State from arguing, and the jury from finding, that he intended harm. It is irrelevant that he had equal rights to his child when the evidence supports an inference that had he gained entry into the residence, he would have harmed Williams to get his son.
¶ 21 In light of our disposition, we need not consider Powell's claim of ineffective assistance of counsel.
II. ADMISSION OF DRUG USE EVIDENCE
¶ 22 Powell claims error in the trial court's admission of evidence that he was under the influence of methamphetamine before and during the events at Williams's home. He argues that the State did not show how this evidence was relevant to any issue at trial. He claims that using methamphetamine has no probative value as it does not make it more or less likely that he committed the charged offense. Finally, he claims that this evidence was highly-prejudicial, character evidence that allowed the jury to convict him on who he was rather than on what he had done. ER 404(b). We agree.
¶ 23 Whether evidence of a defendant's other bad acts should be admitted at trial is governed by ER 404(b), which provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
As this court explained:
Before evidence of other crimes, wrongs, or acts can be admitted over proper objection, the trial court must determine that it is logically relevant to a material issue before the jury and that its probative value outweighs its potential for prejudice. ER 401; ER 403; State v. Kelly, 102 Wash.2d 188, 198, 685 P.2d 564 (1984); State v. Saltarelli, 98 Wash.2d 358, 361-63, 655 P.2d 697 (1982); State v. Robtoy, 98 Wash.2d 30, 42, 653 P.2d 284 (1982); State v. Clark, 48 Wash.App. 850, 863, 743 P.2d 822, review denied, 109 Wash.2d 1015 (1987). In determining whether evidence is logically relevant, the trial court must find that it has a tendency to make more or less probable the existence of a fact that is of consequence to the action, ER 401, Saltarelli, 98 Wash.2d at 363, 655 P.2d 697; see State v. Mutchler, 53 Wash.App. 898, 901, 771 P.2d 1168, review denied, 113 Wash.2d 1002, 777 P.2d 1050, (1989), State v. Thompson, 47 Wash.App. 1, 11, 733 P.2d *1185 584, review denied, 108 Wash.2d 1014 (1987), and generally that such fact will be similar to those listed in ER 404(b). Saltarelli, 98 Wash.2d at 362, 655 P.2d 697; see State v. Goebel (Goebel I), 36 Wash.2d 367, 378-79, 218 P.2d 300 (1950). In weighing probative value against prejudicial effect, the trial court must exercise its discretion, and its decision will be overturned only for abuse of discretion. Robtoy, 98 Wash.2d at 42, 653 P.2d 284; Thompson, 47 Wash.App. at 12, 733 P.2d 584.
State v. Stanton, 68 Wash.App. 855, 861, 845 P.2d 1365 (1993).
¶ 24 The State argues that this evidence was relevant and properly admitted to show Powell's state of mind. It points to Kincaid's testimony that Powell was acting strangely, Officer Watson's testimony about Powell's explosive behavior, and Williams's testimony that Powell was unusually dressed in camouflage and trying to sneak into her home. It also points out that the trial court took an offer of proof from both Williams and Kincaid and disallowed any testimony from Williams that she thought Powell was under the influence of drugs and did not want him around her son for that reason. The trial court found that Williams had no personal knowledge and thus excluded the testimony.
¶ 25 Kincaid's testimony was limited. After explaining that he arrived about 3:30 AM to the defendant's apartment and that Powell was with Pearson, the State asked, "Did you see the Defendant use methamphetamines that morning?" Kincaid replied, "Yes, I did." 1 RP at 120-21. The State then asked about Powell's mood, to which Kincaid replied, "He wasn't being himself. He was anxious." 1 RP at 121. He also noted that Powell was upset with Williams.
¶ 26 Contrary to Powell's claim, his drug use was relevant to his state of mind. The principal question the jury needed to answer was what had Powell intended to do if he had entered Williams's home. This evidence potentially completed the picture of someone who was upset with Williams about keeping his son from him, had threatened to kill her for doing so, and was dressed in camouflage clothing and carrying a loaded fully-functional firearm. The drug use evidence could have been logically relevant to explain Powell's seeming determination to enter Williams's home. The problem is that the State did not offer any expert testimony to explain the actual or even potential effects methamphetamine could have had on Powell. Thus the jurors were left to speculate on this question from their own knowledge, knowing only that Powell was a law breaking drug user. As the evidence in this case was far from overwhelming, we cannot say that the error in admitting testimony about Powell's drug use was harmless. We must reverse.
III. COMMUNITY CUSTODY CONDITIONS
¶ 27 Because this issue and others raised may arise on remand, we address them. Former RCW 9.94A.030(48)(a)(i) (2005) defines attempted first degree burglary as a violent crime. RCW 9.94A.715(1) requires the sentencing court to impose community custody. RCW 9.94A.700(4) lists the conditions that must be imposed unless the court waives them and RCW 9.94A.700(5) provides a list of conditions the sentencing court may impose.[3]
*1186 ¶ 28 RCW 9.94A.700(5)(c) allows the court to impose "crime-related treatment or counseling services." Under this section, drug treatment "`reasonably relates' to the offender's risk of reoffending, and to the safety of the community, only if the evidence shows that [drug use] contributed to the offense." State v. Jones, 118 Wash.App. 199, 208, 76 P.3d 258 (2003). We review the trial court's decision in this regard for an abuse of discretion. State v. Riley, 121 Wash.2d 22, 37, 846 P.2d 1365 (1993).
¶ 29 Powell contends that the trial court erred by sentencing him to drug treatment because his drug use is not related to the offense and thus the legislature did not authorize this condition. Here the trial court did not make an explicit finding that he had a chemical dependency that contributed to the offense. RCW 9.94A.607 permits the sentencing court to impose substance abuse treatment if the court finds that chemical dependency contributed to the offense:
Where the court finds that the offender has a chemical dependency that has contributed to his or her offense, the court may, as a condition of the sentence and subject to available resources, order the offender to participate in rehabilitative programs or otherwise to perform affirmative conduct reasonably related to the circumstances of the crime for which the offender has been convicted and reasonably necessary or beneficial to the offender and the community in rehabilitating the offender.
¶ 30 There was evidence presented at trial that Powell had consumed methamphetamine before committing the offense. Further, at sentencing, both the State and defense asked the court to impose substance abuse treatment as a condition of his sentence.[4] Even though the trial court failed to check the box indicating that Powell had a chemical dependency, the record amply supports its decision.
V. STATEMENT OF ADDITIONAL GROUNDS
A. Jury Instructions
1. Instruction No. 5
¶ 31 Powell first contends that the trial court erred in giving instruction 5 because it directed the jury to find that he intended to commit a crime. That instruction provided:
Evidence has been introduced in this case on the subject of threats against Amber Williams, on dates other than October 13, 2005, on the limited issue of the defendant's intent on October 13, 2005. You must not consider this evidence for any other purpose.
CP 53; Instr. 5.
¶ 32 The trial court constructed this limiting instruction after deciding to allow the July 4, 2005 threat into evidence. When the court asked defense counsel if he objected to the instruction, he replied that he did not object. Powell contends that he did not have to object below because giving this instruction was structural error, directing the jury's verdict. He bases his argument on cases disallowing inference instructions in burglary cases when there is no evidence that the defendant entered the building. See State v. Ogden, 21 Wash.App. 44, 49, 584 P.2d 957 (1978); State v. Bergeron, 105 Wash.2d 1, 19, 711 P.2d 1000 (1985); State v. Jackson, 112 Wash.2d 867, 868-70, 774 P.2d 1211 (1989).
¶ 33 Powell misreads these cases. There the trial courts gave inference instructions based on RCW 9A.52.040. That statute only authorized such an instruction when there was an actual entry into a building:
In any prosecution for burglary, any person who enters or remains unlawfully in a building may be inferred to have acted *1187 with intent to commit a crime against a person or property therein, unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent.
RCW 9A.52.040. In finding that this instruction was improper, the Ogden court noted: "RCW 9A.52.040 authorizes an inference of intent only if a person `enters or remains unlawfully in a building . . .' The instruction as drafted enabled the jury to draw the inference from an attempted entry. The statute does not authorize such an instruction, and therefore comprises error of law." Ogden, 21 Wash.App. at 49, 584 P.2d 957.
¶ 34 This holding simply does not apply here. The trial court's limiting instruction benefited Powell and it did not allow an improper inference.[5]
2. Instruction 17
¶ 35 Powell also contends that the trial court erred in giving instruction 17 because there was no evidence that he used the gun. That instruction provided:
For purposes of a special verdict, the State must prove beyond a reasonable doubt that the defendant was armed with a firearm at the time of the commission of the crime in Count I.
A person is armed with a firearm if, at the time of the commission of the crime, the firearm is easily accessible and readily available for offensive or defensive use. The State must prove beyond a reasonable doubt that there was a connection between the firearm and the defendant or an accomplice. The State must also prove beyond a reasonable doubt that there was a connection between the firearm, and the crime. In determining whether this connection existed, you should consider the nature of the crime, the type of firearm, and the circumstances under which the firearm was found.
A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.
CP 66; Instr. 17.
¶ 36 He argues that this instruction was improper because there was no evidence that he used the handgun in any way during the alleged offense. This lack of evidence, he claims, violated his second amendment right to bear arms. The exception, he acknowledges, is when a nexus exists between the crime, the defendant, and the weapon, citing State v. Schelin, 147 Wash.2d 562, 597, 55 P.3d 632 (2002). Again he acknowledges that he did not object to this instruction at trial but asserts that because it is constitutionally infirm, he may raise it on appeal.
¶ 37 Powell's arguments fail. Recently, in State v. Eckenrode, 159 Wash.2d 488, 150 P.3d 1116 (2007), our Supreme Court explained the evidentiary requirement when the State alleges a firearm enhancement. "As long as any rational trier of fact could have found that he was armed, viewing the evidence in the light most favorable to the State, sufficient evidence exists." Eckenrode, 159 Wash.2d 488, 494, 150 P.3d 1116 (citing State v. DeVries, 149 Wash.2d 842, 849, 72 P.3d 748 (2003); State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992)). Here there was ample evidence that Powell was armed. While being handcuffed, a loaded, fully-functional firearm fell from his waistband. He had actual possession, his weapon was easily accessible and readily available for offense or defensive use, and the court did not err in so instructing the jury.
B. Article I, Section 24 (State Constitution)
¶ 38 In a somewhat repetitive claim, Powell asserts that his constitutional right to bear arms is mandatory under the Washington State Constitution, giving him the right to own, possess, carry, and display arms defensively. Article I, section 24 of the Washington Constitution provides:
SECTION 24 RIGHT TO BEAR ARMS. "The right of the individual citizen to bear *1188 arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men."
While acknowledging that this right does not include criminally offensive use, he argues that the State must show that his use was outside the scope of article I, section 24 of the Washington Constitution. Absent this showing, he argues, there is no nexus.
¶ 39 Again, this was a specific concern that our Supreme Court addressed in Eckenrode, supra. Noting that courts have a duty to protect a defendant's constitutional right to bear arms, it found no constitutional violation when there is evidence of a nexus between the defendant, the weapon, and the crime. Citing U.S. Const. amend. II; Const. art. I, § 24; see also State v. Rupe, 101 Wash.2d 664, 703-08, 683 P.2d 571 (1984) ("constitutionally protected behavior cannot be the basis of criminal punishment;" thus, courts must be protective of the right to bear arms during criminal trials implicating gun possession); State v. Johnson, 94 Wash.App. 882, 892-97, 974 P.2d 855 (1999) (inappropriate to send deadly weapon enhancement to the jury without some showing of both accessibility and nexus). The court then observed:
But we are also mindful of the legislative purpose in creating the deadly weapons enhancement: to recognize that armed crime, including having weapons available to protect contraband, imposes particular risks of danger on society.
Eckenrode, supra (citing State v. Gurske, 155 Wash.2d 134, 138-39, 118 P.3d 333 (2005)).
¶ 40 We reverse and remand for a new trial.
I concur: ARMSTRONG, P.J.
HUNT, J. (dissenting).
¶ 41 I respectfully dissent from the majority's reversal of Powell's conviction. I disagree with the majority's holding that lack of expert testimony about the potential effects of methamphetamine on Powell was reversible error for three reasons.
¶ 42 First, although Powell objected generally to testimony about his ingestion of methamphetamine, he did not specifically object to the lack of expert testimony about the potential effects of methamphetamine on persons in general or on him in particular. Nor did he offer such expert testimony himself or ask the trial court to condition admissibility of his methamphetamine ingestion on the presentation of such expert testimony. Instead, he simply denied having ingested methamphetamine or being under the influence.
¶ 43 The law is well settled that to preserve an objection for appeal, it must be specific and we may not reverse a conviction on a non-constitutional ground raised for the first time on appeal. See, e.g., State v. Boast, 87 Wash.2d 447, 452, 553 P.2d 1322 (1976). The majority's holding contravenes this rule. Thus, the lack of expert testimony, never proffered or requested at trial, cannot support reversal of Powell's conviction.
¶ 44 Second, even if the principles of appellate review allowed us to consider the merits of this issue, the majority cites no law for the proposition that lack of expert testimony about the "actual or potential effects of methamphetamine on Powell" is reversible error, especially where no party noted this alleged deficiency below. And I am aware of none.
¶ 45 Third, that the trial court did not sua sponte condition the admissibility of Kincaid's testimony, about Powell's recent ingestion, on the presentation of expert testimony, about the actual or potential effects of methamphetamine, does not automatically make the ingestion evidence less relevant or unduly prejudicial; nor does it demonstrate that the trial court abused its discretion in allowing Kincaid's testimony. The majority expressly acknowledges that Powell's recent ingestion (1) was relevant to his state of mind  what he was intending to do if he gained entry to Williams' home and, more specifically, whether he intended to commit a crime; and (2)
potentially completed the picture of someone who was upset with Williams about keeping his son from him, had threatened to kill her for doing so, and was dressed in camouflage clothing and carrying a loaded fully-functional firearm. The drug use evidence *1189 could have been logically relevant to explain Powell's seeming determination to enter Williams's home.
Majority Opinion at 1185.[6]
¶ 46 The majority further notes the well-settled rule that trial courts have broad discretion in deciding the admissibility and relevance of evidence and that we may reverse only upon a showing of abuse of that discretion. State v. Stanton, 68 Wash.App. 855, 861, 845 P.2d 1365 (1993), citing State v. Robtoy, 98 Wash.2d 30, 42, 653 P.2d 284 (1982), and State v. Thompson, 47 Wash.App. 1, 12, 733 P.2d 584, review denied, 108 Wash.2d 1014 (1987). Yet the majority asserts the lack of expert testimony about the effects of methamphetamine was prejudicial because it left the jurors to speculate that Powell was a "law breaking drug user." Majority at 1185. In my view, the record does not support this assertion.
¶ 47 The record shows that the trial court carefully weighed the probative value against the prejudicial effect of Powell's ingestion of methamphetamine before exercising its discretion to admit eyewitness testimony that Powell had ingested methamphetamine shortly before going to Williams' home and that Powell "wasn't being himself." Minimizing any undue prejudice, the trial court allowed only part of the State's proffered evidence about Powell's drug use: It expressly excluded Williams' testimony that (1) she believed Powell was under the influence of drugs while he was trying to break into her home, and (2) she was trying to keep her son away from Powell because Powell was a drug user. Contrary to the majority's assertion, the record shows that the trial court specifically excluded evidence that tended to show Powell was a "law breaking drug user." Majority at 1185. The trial court thus exercised its discretion to exclude this prejudicial evidence under ER 404(b) and to allow only limited evidence of Powell's recent use as probative of his state of mind and intent at the time of the crime.[7]
¶ 48 Moreover, the record does not support the majority's assertion that the lack of expert testimony was prejudicial to Powell so as to warrant reversal of his conviction. Even if the trial court had excluded Kincaid's relevant testimony about observing Powell ingesting methamphetamine before leaving for Williams' house, there is ample other evidence in the record to show that the jury would still have convicted Powell: (1) Powell's prior threats that he will kill Williams if she prevented him from seeing their son; (2) eyewitness Kincaid's testimony that Powell was going to Williams' home to take custody of his son and that he "wasn't being himself"; (3) Powell's contrary testimony at trial that he had gone to Williams' house to retrieve a bicycle he had left there; (4) Powell's going to Williams' home armed with a gun, unannounced, and attempts to gain entry surreptitiously, without knocking on the door; (5) eyewitness Officer Watson's testimony that he had observed Powell hunched over, apparently working Williams' door handle to gain entry; (6) Powell's corresponding fabrication on the witness stand at trial that he did not try to open Williams' door but instead knocked and rang the doorbell; (7) Williams' clear testimony to the contrary; and. (8) Powell's initial flight, "conspicuous ignoring" of Officer Watson's command to stop, and subsequent attempts to break away and to flee after Watson apprehended him. The law is clear that a jury can consider flight as evidence of guilt. State v. Price, 126 Wash. App. 617, 645, 109 P.3d 27 (2005) citing State v. Bruton, 66 Wash.2d 111, 112-13, 401 P.2d 340 (1965).
*1190 ¶ 49 According due deference to the court in matters of evidence admissibility, I disagree with the majority's implicit holding that the trial court abused its discretion and violated ER 404(b) when it allowed limited, admittedly relevant evidence of Powell's recent ingestion of methamphetamine without sua sponte conditioning admissibility on the production of expert testimony. In my view, the record does not support the majority's assertion that the lack of expert testimony about the effects of methamphetamine was prejudicial and warrants reversal. I would affirm Powell's jury conviction for attempted first degree burglary while armed with a firearm.
NOTES
[1] Violating RCW 9A.52.020(1), RCW 9A.28.020(3), and RCW 10.99.020.
[2] Violating RCW 9.94A.602 and 9.94A.533(3).
[3] RCW 9.94A.700 provides:

(4) Unless a condition is waived by the court, the terms of any community placement imposed under this section shall include the following conditions:
(a) The offender shall report to and be available for contact with the assigned community corrections officer as directed;
(b) The offender shall work at department-approved education, employment, or community restitution, or any combination thereof;
(c) The offender shall not possess or consume controlled substances except pursuant to lawfully issued prescriptions;
(d) The offender shall pay supervision fees as determined by the department; and
(e) The residence location and living arrangements shall be subject to the prior approval of the department during the period of community placement.
(5) As a part of any terms of community placement imposed under this section, the court may also order one or more of the following special conditions:
(a) The offender shall remain within, or outside of, a specified geographical boundary;
(b) The offender shall not have direct or indirect contact with the victim of the crime or a specified class of individuals;
(c) The offender shall participate in crime-related treatment or counseling services;
(d) The offender shall not consume alcohol; or
(e) The offender shall comply with any crime-related prohibitions.
[4] Defense counsel explained:

He needs treatment. Whether we can get it through DOSA  obviously, we can't. This is a violent offense and he doesn't qualify for that sort of treatment, but I would ask on behalf of his parents and his ex-best friend, whatever it is, mother of his child, that he get treatment.
He's amenable to it. He has seen the state examiner and he qualifies for help.
RP (Mar. 8, 2006) at 6-7.
[5] Defense counsel explained to the jury why the instruction was important and urged it to follow it carefully.
[6] To the majority's recounting of the facts, I would add that (1) Powell intended to gain entry into Williams' home surreptitiously; and (2) he acted on this intent when he went to Williams' home unannounced to remove his son by force if necessary, snuck onto her front porch, tried to open her front door and then her back door without first knocking, without ringing the doorbell, without calling out, and without seeking her consent to enter.
[7] Furthermore, the limited testimony about Powell's use of methamphetamine just before going to Williams' house was consistent with other witnesses' testimony about Powell's acting strangely just before, during and after the burglary of Williams' house. Similarly, courts frequently allow evidence that a defendant had been drinking alcohol just before committing a specific intent crime without requiring expert testimony about the effects of alcohol.