IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32517-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON MICHAEL TAIT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Jason Tait appeals his conviction for possessing methamphetamine. He argues that the trial court wrongly denied his motion to suppress evidence obtained as the result of a traffic stop that Mr. Tait contends was pretextual and thereby unlawful. He also challenges a sentencing condition imposed by the court requiring him to undergo outpatient drug treatment at his expense and a finding of "chemical dependency" that he contends is essential to imposing the condition. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

The State of Washington suspended Jason Tait's driver's license for failure to pay child support. He was stopped for driving with a suspended license several times, according to City of Walla Walla Police Officer Jeremy Pellicer, although as the officer

later explained, "sometimes we will cut them a break and just cite and release them."
Report of Proceedings (RP) at 5.

On January 25, 2013, Officer Pellicer spotted Mr. Tait's car, a gray Mercury Cougar, parked outside the home of Mr. Tait's friend. He confirmed that Mr. Tait's license remained suspended and decided to park and wait to see if Mr. Tait returned and drove. He had learned sometime earlier that Mr. Tait might market or use methamphetamine and recognized that this may present an opportunity to discover supporting evidence. He would also later explain that while he had cut Mr. Tait a break in the past for driving with a suspended license, "it's our—or at least my policy that if someone continually violates the same violation, that we—there are more consequences to it." RP at 5.

Mr. Tait returned to his car shortly after Officer Pellicer parked. When Mr. Tait began to drive away, Officer Pellicer stopped him.

When Officer Pellicer approached Mr. Tait and told him he had stopped him for driving with a suspended license, Mr. Tait admitted to the violation. Before writing the citation, Officer Pellicer contacted Officer Gunner Fullmer, the city's K-9 officer, and asked him to bring his dog—his "K-9 partner"—to the location of the stop. Officer Pellicer knew he was going to take Mr. Tait into custody for the moving violation and that there should be time for Officer Fulmer to deploy his K-9 partner on the car. Officer Pellicer later testified at a suppression hearing that he called Officer Fulmer because "I

2

have had numerous contacts with Jason Tait in the past and I have known him to have drug paraphernalia and drug amounts on him." RP at 6.

When Officer Fulmer arrived, he spoke briefly with Officer Pellicer and then spoke with Mr. Tait while Officer Pellicer prepared the citation for the moving violation. Officer Fulmer identified himself to Mr. Tait, asked if he had any illegal substance in his car or on his person, and when Mr. Tait said no, asked for permission to search the car. Mr. Tait denied permission. Officer Fulmer then told Mr. Tait that he was going to deploy his dog to the outside of the car, retrieved his K-9 partner, and walked him around the outside of the car a couple of times. The dog alerted to the door seams of both the passenger's and driver's side doors.

Officer Fulmer told Officer Pellicer of the dog's reaction and Officer Pellicer decided to arrest Mr. Tait for the suspended license offense. During a search incident to the arrest, Officer Pellicer found a glass smoking pipe on Mr. Tait which later tested positive for methamphetamine.

The officers impounded Mr. Tait's Cougar and obtained a warrant to search it. A pill bottle with a defaced label that contained 36 pills of hydrocodone, a controlled substance, was found inside the car. Mr. Tait was charged with four counts: (1) possession of hydrocodone, (2) possession of methamphetamine, (3) use of drug paraphernalia, and (4) driving while license suspended or revoked in the third degree.

Mr. Tait moved to suppress all of the evidence against him on the ground that Officer Pellicer's stop of his car was pretextual—that his true motive for the stop was to search for drugs. After hearing testimony from officers Pellicer and Fulmer, the trial court denied the motion, later entering the following findings:

> 1. The Court finds that Off[icer] Pellicer had a lawful basis to stop Mr. Tait's vehicle based [on] Mr. Tait's suspended driving status.
> 2. The Court finds that Off[icer] Pellicer would have conducted a traffic stop of Mr. Tait's vehicle regardless of having information that Mr. Tait might possibly be involved in drugs.
> 3. The Court finds that Off[icer] Fulmer's deployment of his K9 partner did not constitute a search of Mr. Tait's vehicle that exceeded the scope of the traffic stop.
> 4. The Court finds that Off[icer] Pellicer had probable cause to arrest Mr. Tait for the suspended driving [license] offense, and that his search of Mr. Tait was a valid search incident to arrest.

Clerk's Papers (CP) at 59.

The State eventually dismissed all charges other than the charge of possession of methamphetamine and Mr. Tait proceeded to a stipulated facts trial, stipulating that the residue on the pipe found on his person was methamphetamine. The trial court found him guilty of possessing methamphetamine.

The standard range for the charge for an individual with no criminal history (Mr. Tait had none) was 0 to 6 months. The court sentenced Mr. Tait to 30 days confinement, gave him credit for 4 days served, and converted his remaining 26 days to 208 hours of community service. Consistent with conditions of sentencing proposed by the State, the trial court told Mr. Tait at sentencing that "based upon your plea to possession of

4

methamphetamine, the Court finds you are guilty and that you have a chemical dependency." RP at 70. The court ordered Mr. Tait to participate in an outpatient drug program at his expense. Mr. Tait made no objection to the drug program condition in the trial court.

Mr. Tait appeals the trial court's suppression decision and the sentencing condition requiring that he participate in an outpatient drug program.

ANALYSIS

*Pretextual Stop*

Jason Tait first contends that the trial court erred in denying his motion to suppress. In arguing that the real motive for the stop was to search him for drugs, he emphasizes the immediate summoning, arrival, and deployment of a drug-sniffing dog.

Mr. Tait does not challenge the trial court's findings of fact entered in denying the suppression motion, so they are verities on appeal. *State v. Brockob*, 159 Wn.2d 311, 343, 150 P.3d 59 (2006). The only question presented for our review, then, is whether the findings of fact support the trial court's conclusion that the glass smoking pipe containing methamphetamine was admissible for the reason it was found during a lawful traffic stop. We review conclusions of law in an order pertaining to suppression of evidence de novo. *State v. Chacon Arreola*, 176 Wn.2d 284, 291, 290 P.3d 983 (2012).

As a general rule, warrantless searches and seizures violate article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513

5

(2002). A traffic stop is a "seizure" for the purpose of constitutional analysis. *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999). One of the narrow exceptions to the warrant requirement recognized by Washington cases is a *Terry*[1] investigative stop, which authorizes police officers "to briefly detain a person for questioning without grounds for arrest if they reasonably suspect, based on 'specific, objective facts,' that the person detained is engaged in criminal activity or a traffic violation." *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007). Such stops must be justified at their inception and must be reasonably limited in scope based on whatever reasonable suspicions legally justified the stop in the first place. *Chacon Arreola*, 176 Wn.2d at 293-94. The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the general rule that a warrant is required. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).

Purely pretextual traffic stops violate article I, section 7 of the Washington Constitution. *Ladson*, 138 Wn.2d at 358. A pretextual traffic stop occurs when a police officer relies on some legal authorization as a mere pretext to dispense with a warrant when the true reason for the seizure is not exempt from the warrant requirement. *Id.* To determine whether a traffic stop is pretextual, Washington courts evaluate the totality of

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

the circumstances, including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior. *Id.* at 358-59.

The trial court found that Officer Pellicer "had a lawful basis to stop Mr. Tait's vehicle based [on his] suspended driving status" and "would have conducted a traffic stop of Mr. Tait's vehicle regardless of having information that Mr. Tait might possibly be involved in drugs." CP at 59. Nevertheless, the fact that Officer Pellicer immediately summoned Officer Fulmer without encountering any evidence of drug possession during the stop reveals that there was a second motive for the stop from the outset. It is properly analyzed as a mixed motivation stop.

Our Supreme Court addressed a mixed motivation stop in *Chacon Arreola*. In that case, a Mattawa police officer responding to a report of a possible DUI (driving under the influence) in progress followed a car meeting the description provided for a considerable distance without seeing any signs of impaired driving. He eventually stopped the driver to cite him for the car's illegally altered exhaust system, although he "was relatively more interested in the potential DUI." 176 Wn.2d at 289. Upon approaching the car, the officer smelled alcohol and saw open containers in the vehicle.

The Supreme Court reversed this court's decision that a mixed motivation stop was unlawful and affirmed the trial court's ruling upholding the traffic stop, explaining that "[a] mixed-motive stop does not violate article I, section 7 so long as the police

7

officer making the stop exercises discretion appropriately." *Id.* at 298. It explained what it meant by an "appropriate" exercise of discretion:

> [I]f a police officer makes an independent and conscious determination that a traffic stop to address a suspected traffic infraction is reasonably necessary in furtherance of traffic safety and the general welfare, the stop is not pretextual. That remains true even if the legitimate reason for the stop is secondary and the officer is motivated primarily by a hunch or some other reason that is insufficient to justify a stop. In such a case, the legitimate ground is an independent cause of the stop and privacy is justifiably disturbed due to the need to enforce traffic regulations, as determined by an appropriate exercise of police discretion.

*Id.* at 298-99.

The court said that a trial court "should consider the presence of an illegitimate reason or motivation" when determining the critical issue of "whether the officer really stopped the vehicle for a legitimate and independent reason (and thus would have conducted the traffic stop regardless)." *Id.* at 299. But it reasoned that "a police officer cannot and should not be expected to simply ignore the fact that an appropriate and reasonably necessary traffic stop might also advance a related and more important police investigation." *Id.*

Mr. Tait attempts to distinguish *Chacon Arreola* in two ways: he argues that Officer Pellicer did not treat the stop like any other stop, as evidenced by the drug sniff;[2]

---

[2] In *Chacon Arreola*, the Supreme Court observed that "[u]p to [the point of the pulling over and approaching Chacon], Officer Valdivia had 'treated the stop just like any other traffic stop.'" 176 Wn.2d at 290.

and, unlike the officer in *Chacon Arreola* who smelled alcohol and saw open containers during the lawful detention, the lawful detention of Mr. Tait did not lead to corroborating observations that confirmed Officer Pellicer's suspicions of drug possession. But facts of this sort, while recounted in *Chacon Arreola*, were not the Supreme Court's key concern.

Rather, critical to the court in *Chacon Arreola* was the unchallenged trial court finding that the officer would have stopped Mr. Chacon's car even if he had not suspected that he was the reported drunk driver. As the court explained:

> A trial court's consideration of a challenge to an allegedly pretextual traffic stop should remain direct and straightforward. The trial court should consider both subjective intent and objective circumstances in order to determine whether the police officer actually exercised discretion appropriately. *The trial court's inquiry should be limited to whether investigation of criminal activity or a traffic infraction (or multiple infractions), for which the officer had a reasonable articulable suspicion, was an actual, conscious, and independent cause of the traffic stop.*

176 Wn.2d at 299-300 (emphasis added). In this case, the trial court's finding that "Officer Pellicer would have conducted a traffic stop of Mr. Tait's vehicle regardless of having information that Mr. Tait might possibly be involved in drugs" is not challenged. CP at 59.

Finally, the court in *Chacon Arreola* stated that "an officer's motivation to remain observant and potentially advance a related investigation does not taint the legitimate basis for the stop so long as discretion is appropriately exercised *and the scope of the stop remains reasonably limited based on its lawful justification.*" *Id.* at 299 (emphasis

9

added). Mr. Tait argues that the scope of the traffic stop in his case ceased to be reasonably limited when Officer Pellicer asked Officer Fullmer to come to the scene.

In *State v. Boursaw*, 94 Wn. App. 629, 634-35, 976 P.2d 130 (1999), this court found that a K-9 search of a vehicle incident to a driver's arrest, even after the driver's removal from the vehicle, was constitutional. The *Boursaw* court emphasized that the deployment of the dog only took ten minutes. *Cf. Illinois v. Caballes*, 543 U.S. 405, 409-10, 125 S. Ct. 834, 838, 160 L. Ed. 2d 842 (2005) (a dog sniff conducted during a lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment). Mr. Tait's own declaration in support of his motion to dismiss acknowledged (relying on time information included on video filmed from Officer Pellicer's car) that the officer pulled him over at 4:17 p.m., that Officer Fulmer arrived five minutes later, that Officer Fulmer spent "over three and one-half minutes trying to convince me to let him search my car," and, when Mr. Tait would not consent, that Officer Fulmer completed deploying the dog by 4:30 p.m. CP at 20-21. This evidence of a short detention is sufficient to support the trial court's finding that summoning Officer Fulmer did not cause the scope of the stop to exceed its lawful justification as a traffic stop.

The trial court's findings support its conclusion that Officer Pellicer's stop, while a mixed motivation stop, was lawful. The suppression motion was properly denied.

*Chemical Dependency*

The trial court ordered Jason Tait to participate in an outpatient drug program at his expense. Relying on RCW 9.94A.607, Mr. Tait argues that the sentencing court was not authorized to impose the condition without making a finding that he was chemically dependent. He argues that a finding of chemical dependency must be based on an "examination or evaluation" sufficient to establish that the defendant is a "persistent and pathological" user of drugs. Appellant's Br. at 10.

*Error Preservation*

A threshold issue is whether Mr. Tait may complain about the drug program condition for the first time on appeal. RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them. *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012). We may decline to address an issue under RAP 2.5(a) sua sponte. *State v. Kirkpatrick*, 160 Wn.2d 873, 880 n.10, 161 P.3d 990 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012).

In *State v. Armstrong*, 91 Wn. App. 635, 959 P.2d 1128 (1998), Division One of our court concluded that a defendant could challenge sentencing conditions for the first time on appeal despite RAP 2.5(a). It relied on a series of decisions, the then-most recent being *State v. Moen*, 129 Wn.2d 535, 919 P.2d 69 (1996), in which our Supreme Court

11

held that a challenge to a sentence on the basis that it is contrary to law may be raised for the first time on appeal. *Armstrong* nonetheless held that where a sentence condition is not challenged in the trial court, any limitations of the record are properly construed against the defendant on appeal:

> If [the defendant] had raised his objections in the trial court, the State could have made a more complete record in support of them. Similarly, the trial court could have either modified the conditions or made a more thorough statement on the record in explaining its reasoning for imposing the challenged conditions. . . . For these reasons, we adhere to the usual rule that the party seeking review has the burden of perfecting the record so that this court has all relevant evidence.

91 Wn. App. at 638-39.

More recent decisions of our Supreme Court, and particularly *State v. Blazina*, 182 Wn.2d 827, 834, 344 P.3d 680 (2015) have clarified that *Moen* and similar cases represent what is a "narrow category" of cases in which sentencing error need not be preserved: cases presenting, *e.g.*, "inconsistent sentences for the same crime" or "unjust punishment." *Id.* Holding that sentencing error in imposing legal financial obligations (LFOs) *is* subject to the preservation requirement of RAP 2.5(a), the court explained:

> [A]llowing challenges to discretionary LFO orders would not promote sentencing uniformity in the same way. The trial court must decide to impose LFOs and must consider the defendant's current or future ability to pay those LFOs based on the particular facts of the defendant's case. . . . The legislature did not intend LFO orders to be uniform among cases of similar crimes. Rather, it intended each judge to conduct a case-by-case analysis and arrive at an LFO order appropriate to the individual defendant's circumstances. Though the statute mandates that a trial judge consider the defendant's ability to pay and, here, the trial judges erred by

12

failing to consider, this error will not taint sentencing for similar crimes in the future. The error is unique to these defendants' circumstances, and the Court of Appeals properly exercised its discretion to decline review.

*Id.*

In light of *Blazina*, we conclude that RAP 2.5(a) probably applies, with the result that we need not consider the alleged sentencing error. Nonetheless, because the decision in *Blazina* postdated the briefing in this case and Mr. Tait has not had the opportunity to try to persuade us otherwise, we will review his challenge to the sentence condition. Given his failure to object to the condition in the trial court, we will apply *Armstrong*'s holding that the limitations in the record are properly construed against Mr. Tait.

*No Showing of Manifest Abuse of Discretion*

Trial courts may only impose conditions of community custody that are authorized by the legislature. *State v. Kolesnik*, 146 Wn. App. 790, 806, 192 P.3d 937 (2008). Under RCW 9.94A.505(8), a sentencing court "may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter." Applying the last antecedent rule to the phrase "as provided in this chapter," the statute has been construed as constituting an independent grant of authority under which courts may impose crime-related prohibitions, but as requiring that any affirmative condition imposed have a statutory basis elsewhere in the Sentencing Reform Act of 1981, ch. 9.94A RCW (SRA). *State v. Acrey*, 135 Wn. App. 938, 943-44, 146 P.3d 1215 (2006). The "as provided in this chapter" phrase "is meant to refer to an overarching distinction between crime-

13

related prohibitions and affirmative conduct conditions present throughout the SRA."

*State v. Armendariz*, 160 Wn.2d 106, 114, 156 P.3d 201 (2007) (citing *Acrey*, 135 Wn.

App. at 944-45). The distinction between crime-related prohibitions and affirmative

conditions is reflected in the definition of "crime-related prohibition" as meaning "an

order of a court prohibiting conduct that directly relates to the circumstances of the crime

for which the offender has been convicted, and shall not be construed to mean orders

directing an offender affirmatively to participate in rehabilitative programs or to

otherwise perform affirmative conduct." RCW 9.94A.030(10).

The trial court's order that Mr. Tait "will participate in an outpatient []drug

program at his expense" imposes an affirmative condition. See *State v. Parramore*, 53

Wn. App. 527, 532, 768 P.2d 530 (1989) ("Although 'affirmative conduct' is not defined

. . . the context in which it is used suggests active involvement in pursuit of a goal").

Two provisions of the SRA, arguably provide a statutory basis for the court's drug

treatment sentencing condition.

One is former RCW 9.94A.607(1)(1999), which Mr. Tait assumes is the basis for

the condition. It provides in relevant part that

> Where the court finds that the offender has a chemical dependency that has
> contributed to his or her offense, the court may, as a condition of the
> sentence and subject to available resources, order the offender to participate
> in rehabilitative programs or otherwise to perform affirmative conduct
> reasonably related to the circumstances of the crime for which the offender
> has been convicted and reasonably necessary or beneficial to the offender
> and the community in rehabilitating the offender.

14

Another is RCW 9.94A.703(3), which authorizes courts to order as conditions of community custody (among others) that an offender "[p]articipate in crime-related treatment or counseling services" or "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.703(3)(c) and (d).

The record is not clear which statutory basis was intended by the State, which proposed the condition, or which was relied on by the sentencing court. We conclude that it does not matter, as either is sufficient.[3]

We review a sentence condition for an abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). In the context of determining whether a sentence condition was reasonably crime-related, our Supreme Court has observed that sentence

_____

[3] Weighing in support of RCW 9.94A.607 as the basis are the court's statement at sentencing that "based upon your plea to possession of methamphetamine, the Court finds you are guilty and that you have a chemical dependency," RP at 70, and its making the preprinted finding on the felony judgment and sentence form that "The court finds that the defendant has a **chemical dependency** that has contributed to the offense(s)" (but even that finding is followed by an unparticularized reference to "RCW 9.94A.__"). CP at 66.

Weighing in favor of RCW 9.94A.703 as the basis for the condition is the fact that it appears in an appendix to the judgment and sentence, presented by the State, that consists largely of community custody conditions imposed incident to Mr. Tait's sentence to 12 months' community custody.

15

conditions "are usually upheld." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). Sentence conditions will be reversed only if manifestly unreasonable such that no reasonable man would take the view adopted by the trial court. *Riley*, 121 Wn.2d at 37.

The facts stipulated for purposes of trial included the fact that Officer Pellicer called dispatch for backup on the day of the arrest "because he had learned information that Mr. Tait might be involved in dealing and using methamphetamine." CP at 61. They included the fact that Mr. Tait denied having anything illegal in the car and refused to consent to a search. *Id.* at 61-62. They included the fact that during a search incident to arrest, Mr. Tait was found to be carrying a small pipe that contained methamphetamine.

Although some charges were later dropped by the State, Mr. Tait's possession of the pipe, the methamphetamine, and hydrocodone tablets found in his car subjected him to two counts of violating RCW 69.50.4013, a class C felony punishable by 5 years' incarceration or $10,000, or both; and one count of violating RCW 69.50.412(1), a misdemeanor punishable by 90-days incarceration, a fine of not more than $1,000, or both. Unlike alcohol or marijuana, which can be consumed legally, Mr. Tait's use of methamphetamine subjected him to this risk of prosecution and punishment. While it may be minimal evidence of a chemical dependency, Mr. Tait's willingness to expose himself to substantial criminal penalties in order to smoke methamphetamine is some

16

evidence of a chemical dependency. As was the case in *Armstrong*, absent a better-developed record of why the State suggested the drug treatment condition and why the court imposed it, we cannot conclude that the trial court committed a manifest abuse of discretion in making the chemical dependency finding and imposing the treatment condition.

We also note that the history of RCW 9.94A.607, enacted in 1999 with the passage of Engrossed Second Substitute H.B. 1006 (E2SHB), indicates that the legislature had a low threshold in mind for the chemical dependency finding, viewing drug treatment as something from which a large number of offenders would benefit. The final bill report for E2SHB 1006 states, by way of "background," that "[t]he Department of Corrections reports that 80 percent of offenders that are sentenced are arrested for a drug offense or a crime that is a result of a chemical dependency."[4]

Affirmed.

---

[4] While not applicable to Mr. Tait's case, we also observe that following a recent amendment, RCW 9.94A.607 now provides that "[a] rehabilitative program may include a directive that the offender obtain an evaluation as to the need for chemical dependency treatment related to the use of alcohol or controlled substances, regardless of the particular substance that contributed to the commission of the offense." LAWS OF 2015, ch. 81, § 2. The statute thus explicitly recognizes that a sentencing court's finding of chemical dependency and ordering of drug treatment may *precede* an evaluation as to whether chemical dependency treatment is needed.

17

No. 32517-2-III
*State v. Tait*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

I CONCUR:

_____
Korsmo, J.

No. 32517-2-III

FEARING, J. (concurring in part; dissenting in part) — I agree with the majority's

ruling affirming the trial court's denial of Jason Tait's motion to suppress and affirming

the conviction of Tait for possession of methamphetamine. I disagree with and dissent

from the majority's affirmation of the sentencing condition imposed by the trial court

requiring Tait to undergo outpatient drug treatment. The trial court merely stated: "Mr.

Tait, based upon your plea to possession of methamphetamine, the Court finds you are

guilty and that you have a chemical dependency." Report of Proceedings (RP) at 70. I

agree with Jason Tait that the evidence does not support a finding of "chemical

dependency," let alone a finding that a chemical dependency contributed to the crime. I

conclude the sentencing condition was error.

The controlling statute is RCW 9.94A.607, a section of Washington's Sentencing

Reform Act of 1981, ch. 9.94A RCW (SRA). The statute reads:

> Where the court *finds* that the offender has a *chemical dependency*
> that has *contributed to his or her offense*, the court may, as a condition of
> the sentence and subject to available resources, order the offender to
> participate in rehabilitative programs or otherwise to perform affirmative
> conduct reasonably related to the circumstances of the crime for which the

offender has been convicted and reasonably necessary or beneficial to the offender and the community in rehabilitating the offender.

(Emphasis added.) This statute authorizes the trial court to order an offender to obtain a chemical dependency evaluation and to comply with recommended treatment only if it finds that the offender has a chemical dependency that contributed to his or her offense. *State v. Warnock*, 174 Wn. App. 608, 612, 299 P.3d 1173 (2013). The trial court may order the treatment only if the defendant is subject to community custody. *In re Postsentence Review of Childers*, 135 Wn. App. 37, 41, 143 P.3d 831 (2006).

Jason Tait challenges the trial court's finding of a chemical dependency for insufficient evidence. This court reviews challenged findings of fact for substantial evidence. *State v. Mann*, 157 Wn. App. 428, 441, 237 P.3d 966 (2010). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person that the fact is true. *Mann*, 157 Wn. App. at 441.

To resolve Jason Tait's contention we must first determine what constitutes a chemical dependency within the meaning of RCW 9.94A.607. If there is no chemical dependency, no dependency could have contributed to the crime. RCW 9.94A.607 does not define "chemical dependency." Nor does RCW 9.94A.030, the definitional section of the Sentencing Reform Act, establish a meaning for the term.

In *State v. Hutsell*, 120 Wn.2d 913, 917, 845 P.2d 1325 (1993), our Supreme Court defined "dependence" upon a psychoactive substance in a case addressing whether the defendant was entitled to a sentence below the standard sentencing range. Allen

2

Hutsell argued that his dependence on illicit drugs diminished his ability to appreciate the wrongfulness of his conduct and thus the dependency constituted a mitigating factor under the SRA. "Chemical dependency" was not a term used in a statute addressed in the decision. The Supreme Court wrote:

> Dependence is a mental disorder, distinct from the direct physiological effects of psychoactive substance use, i.e., intoxication and withdrawal. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 165 (3d rev. ed. 1987) (DSM-III-R). Dependence has nine characteristic symptoms, three of which are necessary for diagnosis. DSM-III-R, at 166-67. Some of these symptoms include: unintended excessive substance use (e.g., intending to take only one drink, but nevertheless drinking until severely intoxicated), unsuccessful efforts to reduce or control substance use, preoccupation with activities necessary to obtain and pay for the substance (e.g., theft), and persistent use despite recognition of the resulting physical, psychological, and social problems. DSM-III-R, at 166-68.

*State v. Hutsell*, 120 Wn.2d at 917.

The state Supreme Court, in *State v. Hutsell*, ruled that sufficient evidence supported the trial court's finding that Allen Hutsell was chemically dependent, but the court did not share the evidence that supported the finding. The finding did not help Hutsell anyway because the court ruled that chemical dependence was not a mitigating factor for sentencing.

RCW 70.96A.020 defines "chemical dependency" in the setting of public health law. The statute reads, in relevant part:

> (5) "Chemical dependency" means:
> (a) Alcoholism; (b) drug addiction; or (c) dependence on alcohol and one or more other psychoactive chemicals, as the context requires.

3

. . . .
(10) "Drug addiction" means a disease characterized by a dependency on psychoactive chemicals, loss of control over the amount and circumstances of use, symptoms of tolerance, physiological or psychological withdrawal, or both, if use is reduced or discontinued, and impairment of health or disruption of social or economic functioning.

In *State v. Warnock*, 174 Wn. App. 608 (2013), this court refused to rely on RCW 70.96A.020 when determining if a defendant was chemically dependent for purposes of RCW 9.94A.607. The principal reason for rejecting the definition under RCW 70.96A.020 was that the defendant was intoxicated at the time of the offense, not high on controlled substances.

In *State v. Powell*, 139 Wn. App. 808, 162 P.3d 1180 (2007), *rev'd on other grounds*, 166 Wn.2d 73, 206 P.3d 321 (2009), this court affirmed a trial court sentence that included substance abuse treatment under RCW 9.94A.607. Nevertheless, both the State and the defendant sought imposition of the treatment. This court affirmed the sentence condition despite the trial court's failure to "check the box" indicating Powell had a chemical dependency. *State v. Powell*, 139 Wn. App. at 820. This court concluded that the record amply supported the trial court decision. The only fact mentioned by this court, however, was Powell's consumption of methamphetamine before committing the charged crime of burglary.

Assuming we correctly define "chemical dependency," we must next determine if evidence supported the trial court's finding that Jason Tait was chemically dependent. The evidence upon which the trial court convicted showed that, upon a traffic stop, Tait

4

possessed a glass smoking pipe that tested positive for methamphetamine. A pill bottle with a defaced label that contained hydrocodone, a schedule II controlled substance, lay in his car. The record does not show that Jason Tait imbibed the methamphetamine before driving. He was not under the influence of a controlled substance when stopped in his car.

One could argue that Tait must be chemically dependent because he drove with his driver's license suspended while in the possession of methamphetamine and hydrocodone. He was subject to easy arrest and thus must have labored under a compulsion to commit the imprudent act. At the same time, Tait might not have reflected on his behavior and drove the car without a care or sense of caution. Offenders routinely perform unwise acts without the conduct being caused by a chemical dependency.

The State asks this court to rely on Tait's reputation with police to support the finding of chemical dependency. The State writes: "From numerous contacts, police knew [Tait] to have been in possession of illegal drugs and the paraphernalia to personally consume them." Resp't's Br. at 9-10. Nevertheless, the details surrounding these contacts are not in the record. And, at most, Tait's reputation with police shows use, not dependence.

A finding of chemical dependency should not rest on one's reputation. Also, use alone does not establish dependency. Otherwise, the statute would read that the court may impose chemical dependency treatment merely upon use of a controlled substance,

5

rather than chemical dependency. Under the trial court's reasoning, the statute would read that, upon conviction for possession of a controlled substance, the trial court may order attendance at a drug treatment program.

The State presented no evidence of unintended excessive substance use, unsuccessful efforts to reduce or control substance use, preoccupation with activities necessary to obtain and pay for the substance, persistent use despite recognition of the resulting physical, psychological, and social problems, or withdrawal symptoms. Thus, substantial evidence does not support the finding of chemical dependency.

Two foreign cases address the boundaries of chemical dependency in other settings. These cases support my conclusion, as both distinguish use and dependency.

In *Kim v. Gen-X Clothing, Inc.*, 287 Neb. 927, 845 N.W.2d 265 (2014), a worker compensation case, the reviewing court addressed whether the trial court correctly ordered the employer to pay for chemical dependency treatment undergone by the worker. The employee argued that the treatment was needed as a result of reliance on drugs because he suffered posttraumatic stress disorder. The worker sustained stress as a result of a robbery at work. The employer emphasized that the employee consumed illegal drugs most of his life and thus the robbery did not cause any chemical dependency. The reviewing court upheld the trial court because past recreational use of drugs did not meet the employee's expert's definition of chemical dependency.

In *Peterson v. Northwest Airlines Inc.*, 753 N.W.2d 771 (Minn. Ct. App. 2008),

6

No. 32517-2-III
*State v. Tait* - concurring in part and dissenting in part

Gregory Peterson sought unemployment compensation after his employer, Northwest Airlines, fired him for consuming alcohol while on flight reserve status. A Minnesota statute denied compensation if the employee was fired for "misconduct." An exception read: "conduct that was a direct result of the applicant's *chemical dependency* is not employment misconduct." *Peterson v. Northwest Airlines, Inc.*, 735 N.W.2d at 774. (Emphasis added). The reviewing court affirmed the denial of unemployment benefits. The employee had difficulty consuming alcohol in a responsible manner, but it did not follow that he was chemically dependent. Peterson provided no formal diagnosis, or other evidence, that established that he was chemically dependent. The Minnesota court wrote:

> While there is no statutory definition of chemical dependency, [the employee's] conception of chemical dependency is over-inclusive. As [the employer] points out, an individual can make mistakes with alcohol or abuse alcohol without being chemically dependent. . . . [T]wo chemical-dependency evaluations, one three months before the incident and one six months after the incident, concluded that [the employee] was not chemically dependent.

*Peterson v. Northwest Airlines, Inc.*, 753 N.W.2d at 777.

Fearing, J.

7