IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| STATE OF WASHINGTON, | ) | No. 32695-1-III |
|---|---|---|
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| OSCAR ALFRED ALDEN, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — On June 9, 2013, Oscar Alden shot and killed Tom

Maks. Mr. Alden unsuccessfully claimed self-defense at trial. Mr. Alden's self-defense

claim hinged on whether Mr. Maks, who he mistakenly believed was armed, lunged

toward Mr. Alden. The jury heard testimony that several minutes before the shooting, an

intoxicated, aggressive, and armed Mr. Maks entered the residence where Mr. Alden and

his friends were staying, threatened multiple members of the group, and then left. The

jury found Mr. Alden guilty of both second degree murder and first degree manslaughter.

To avoid a double jeopardy violation, the trial court dismissed the lesser first degree

manslaughter charge.

On appeal, Mr. Alden argues: (1) he did not receive a unanimous jury verdict; (2) the trial court should have admitted res gestae evidence that Mr. Maks was acting aggressive and bizarre in the 12 hours leading up to the shooting, despite the fact that Mr. Alden did not know of Mr. Maks' behavior; (3) the trial court should have allowed members of his group of friends to testify about his reputation for peacefulness; (4) the "to convict" second degree murder jury instruction violated the "yardstick rule" as it did not include that the State had to prove the absence of self-defense beyond a reasonable doubt; (5) he received ineffective assistance of counsel; and (6) the trial court should have granted him an exceptional downward sentence. After examining each argument, we affirm.

## FACTS AND PROCEDURE

For a group of friends in their early 20s, a birthday party at a Sun Cove area vacation home ended with the claimed self-defense shooting of the neighbor. In the early morning of June 9, 2013, 23-year-old Oscar Alden shot Tom Maks in the head, killing him instantly in the driveway of the vacation home. Mr. Alden unsuccessfully claimed self-defense at trial.

*1. Testimony presented at trial*

Prior to the incident, Dayton Wiseman invited several friends, including Mr. Alden, to spend the weekend at his family's vacation home. The occasion was Mr. Wiseman's 23rd birthday. In addition to Mr. Wiseman and Mr. Alden, the group included Raymond Roberts, Dane Meier, Victoria Lincoln, Andrew Ross, Eric Hansen, and Jordan Court. That same weekend, Mr. Maks was staying at a vacation home next door. On Friday, Mr. Wiseman and Mr. Maks briefly chatted while Mr. Wiseman was outside fixing his jet ski.

On Saturday, Mr. Alden's group spent most of the day drinking. Sometime around noon, Mr. Maks came to the vacation home and traded Mr. Roberts a bag of marijuana for pistol ammunition. Mr. Alden testified that sometime that afternoon, Mr. Maks approached him when he was getting something out of his trunk, and tried to acquire some of Mr. Alden's prescribed Adderall. According to Mr. Alden, Mr. Maks then threw a beer bottle cap on top of Mr. Alden's backpack in the trunk, made a sarcastic remark, and then attempted to rummage through his backpack.

That evening, the group went out to the bars in Chelan and invited Mr. Maks. The group left for Chelan between 9:30 and 10:00 p.m. Mr. Alden was a designated driver, and Mr. Maks approached him for a ride. According to Mr. Alden, he did not let Mr.

3

Maks in his car because he felt uncomfortable based on their interaction earlier that day. Mr. Maks ended up getting a ride from another member of the group. Members of the group described Mr. Maks as drunk, peculiar, and somewhat aggressive around this time. Once the group reached Chelan, Mr. Maks drank with them for a while and became even more intoxicated. Mr. Wiseman became intoxicated and began running down the streets of Chelan. The group lost track of Mr. Maks. Between midnight and 1:00 a.m., the group went back to Sun Cove without Mr. Maks.

Once they returned to the vacation home, most of the group fell asleep in various rooms. Mr. Alden fell asleep in one of the recliners. Sometime later, an angry Mr. Maks entered the vacation home to confront the group for leaving him in Chelan. With a glass of wine in his hand, Mr. Maks made comments about throwing members of the group off the deck. Mr. Maks put his palm in Ms. Lincoln's face, and flipped over the chair Mr. Alden was sleeping in. Multiple members of the group testified that Mr. Maks had a pistol[1] tucked into the back of his waistband. Mr. Hansen testified that Mr. Maks threatened him: "'How about I give you one to the left, one to the right and one down the center.'" Report of Proceedings (RP) at 992.

_____

[1] The parties stipulated, "That on the evening of June 8, 2013, at approximately 9:30 p.m., Tom Maks left the residence of [a] friend, and had in his possession his 45 caliber 1911 semi-automatic pistol." Clerk's Papers (CP) at 286.

4

According to Mr. Alden, Mr. Maks was yelling, "'You left me in Chelan, you fat, selfish mother f—ers.'" RP at 1102. Mr. Alden testified that Mr. Maks told him specifically, "'I'm going to chop your dick off and feed it to my dog.'" RP at 1103. Mr. Alden claims that at this time, he saw Mr. Maks had some sort of weapon tucked into his back pocket or waistband. Mr. Alden testified that he later heard a woman scream, "'Oh, my God, he's got a gun.'" RP at 1109.

After the police were called, Mr. Roberts and Mr. Meier escorted Mr. Maks out of the house. Mr. Maks disappeared, most likely going back next door. Because of fear Mr. Maks might vandalize their cars, Mr. Roberts and Mr. Meier waited for the police outside. Mr. Maks returned shortly thereafter, and Mr. Roberts and Mr. Meier told him to leave because the police were on their way. After a few words were exchanged, Mr. Roberts said to Mr. Maks, "'If you didn't have your gun on you I would kick your ass right now.'" RP at 508. In reply, Mr. Maks lifted his shirt up, and spun around to show he was unarmed. Mr. Maks then took off his shirt, pants, and flip-flops, leaving himself dressed only in his underwear. Mr. Roberts testified that as Mr. Maks was undressing, Mr. Maks made multiple vulgar remarks to him. Mr. Maks then slapped Mr. Meier, and the two began to scuffle. Mr. Roberts then punched Mr. Maks multiple times, knocking

5

him to his knees. The two continued to fight, and Mr. Roberts punched Mr. Maks in the back and side of the head.

After Mr. Roberts had knocked Mr. Maks to the ground, Mr. Alden and Mr. Ross exited the vacation home. When Mr. Roberts saw Mr. Alden, he told Mr. Alden to get his gun. Mr. Alden testified that he believed Mr. Maks had a gun, and he thought his friends were trying to wrestle it away from Mr. Maks. Mr. Alden then retrieved his gun from his vehicle, and chambered a round as he ran to where his friends and Mr. Maks were. Mr. Alden testified: "I was afraid and I desperately needed to protect my friends and I needed to—as I said, I had to stop this guy and hold him at gunpoint until the cops got there." RP at 1128. Mr. Ross testified that he, along with Mr. Alden, approached the scene of the scuffle, also armed with a gun.

The testimony presented to the jury differed on whether Mr. Maks was moving when Mr. Alden pulled the trigger. Mr. Meier testified that Mr. Alden walked up briskly and shot Mr. Maks from about two feet away. According to Mr. Meier, Mr. Maks was moving, but he was still on his knees and made a movement that was "not jerky but it wasn't slow." RP at 419. Mr. Roberts testified that Mr. Alden was about six inches from Mr. Maks when he shot him, and that Mr. Maks made "no major movements." RP at 526. Mr. Ross testified that before the shot was fired, Mr. Maks was in a "Muslim prayer

6

position where your feet are kind of tucked under you, you know, butt on your feet." RP at 699. Consistent with his self-defense claim, Mr. Alden testified that before he pulled the trigger, Mr. Maks made a sudden movement "like a football player lunging to tackle me." RP at 1130. He also testified that he thought Mr. Maks had a gun in his hand, and "I've never been so scared in my life." RP at 1131. According to Mr. Alden, he was not aware that Mr. Maks was only in his underwear until after he shot him. After the shooting, Mr. Ross told Mr. Alden to unload the gun and put it down, which he did.

Mr. Maks' autopsy was performed by Dr. Gina Fino. Even though there was only a single bullet, the autopsy showed that Mr. Maks had three perforating gunshot wounds: (1) an entry wound on the top right of his head and exit wound near his left ear, (2) a through-and-through wound on the upper left arm, and (3) a through-and-through wound on the top of the left fifth finger.[2] At the time of his death, Mr. Maks had a blood alcohol level between 0.28 percent and 0.34 percent.

### 2. Pretrial evidentiary rulings

Prior to trial, Mr. Alden moved in limine to present res gestae evidence of bizarre and aggressive behavior, unknown to Mr. Alden at the time of the shooting, by Mr. Maks

---

[2] According to expert witnesses presented by the defense, the bullet went through Mr. Maks' head, then through his finger, before finally passing through his left arm. The experts opined that this could be consistent with Mr. Maks lunging toward Mr. Alden

in the 12 hours leading up to the shooting. During oral argument, defense counsel

clarified that the res gestae evidence would be used to show Mr. Maks' behavior, and not

his character, in order to give the jury the whole picture. Within the 12-hour period, Mr.

Maks had supposedly caused a scene at a convenience store by threatening an employee

and throwing a propane tank at her. He was also kicked out of a bar based on erratic

behavior. The State countered that acts of the victim not within the knowledge of the

defendant are inadmissible in a self-defense case, and also that even if such evidence was

relevant, it should be excluded because its probative value is substantially outweighed by

its prejudicial effect under ER 403. The trial court granted Mr. Alden's res gestae motion

to the extent that Mr. Alden knew of Mr. Maks' behavior, reasoning it was relevant only

to show Mr. Alden's state of mind during the shooting.

Before opening statements were given and outside the presence of the jury,

defense counsel told the trial court that he hoped to introduce evidence of Mr. Alden's

reputation for peacefulness among Mr. Alden's group of friends that were at the vacation

home. The trial court denied the request, and stated, "I don't believe that [Mr. Alden's]

friends that he associates with . . . constitutes a community" as "a valid community must

be neutral enough and generalized enough to be classified as a community." RP at 184.

---

when the fatal shot was fired.

8

Although defense counsel argued that the community was comprised of people with whom Mr. Alden went to school, the trial court stated "I presume everybody has a friend." RP at 191.

### 3. The verdict and the jury instructions

The original criminal information filed on June 11, 2013, charged Mr. Alden with second degree murder. However, on May 30, 2014, the State amended the information to include a charge of first degree manslaughter as a "lesser included offense." CP at 182. On July 17, 2014, the State filed a second amended information that included the charges for both second degree murder and first degree manslaughter, but did not include the "lesser included offense" language. Mr. Alden's trial began July 21, 2014, and lasted 6 days.

Jury instruction 21 instructed the jury that it had a duty to discuss the case with one another to reach a "unanimous verdict." CP at 327. The jury was given three separate verdict forms, verdict form A for second degree murder, verdict form B for first degree manslaughter, and verdict form C for second degree manslaughter. Jury instruction 22 instructed the jury how to proceed with the various verdict forms. Jury instruction 22 provided in relevant part:

9

When completing the verdict forms, you will consider the crime of Murder in the Second Degree as charged. If you *unanimously* agree on a verdict, you must fill in the blank provided in Verdict Form A the words "not guilty" or the word "guilty," according to the decision you reach. If you find the defendant guilty of Murder in the Second Degree on Verdict Form A, do not use Verdict Form C.

You will also consider the crime of Manslaughter in the First Degree as charged. If you *unanimously* agree on a verdict, you must fill in the blank provided in Verdict Form B the words "not guilty" or the word "guilty," according to the decision you reach. If you cannot agree on a verdict, do not fill in the blank provided in Verdict Form B. If you find the defendant guilty of Manslaughter in the First Degree on Verdict Form B, do not use Verdict Form C.

. . . .

*Because this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the verdict forms to express your decision. . . .*

CP at 328-29 (emphasis added).

Jury instruction 7 contained the elements that the State was required to prove beyond a reasonable doubt to convict Mr. Alden of murder in the second degree. Jury instruction 10 contained the elements that the State was required to prove beyond a reasonable doubt to convict Mr. Alden of manslaughter in the first degree. Finally, jury instruction 15 provided in relevant part:

It is a defense to a charge of murder or manslaughter that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the lawful defense of . . . any person in the slayer's presence or company [if three conditions described are met]:

. . . .

10

> The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

CP at 321.

During jury deliberations, the jury foreman sent the trial court a note that stated, "We are confused on the charging decisions we are to make. Is the defendant charged with both 2nd degree murder and 1st degree manslaughter[?] Do we need to convict on both counts?" CP at 302 (underlining in original). After conferring with counsel for both parties, the trial judge sent the following written response to the jury: "The defendant is charged with both Murder in the Second Degree and Manslaughter in the First Degree. You can find him not guilty of either or both and/or guilty of either or both." CP at 302.

The jury found Mr. Alden guilty of both second degree murder and first degree manslaughter. After the verdict, the trial court asked each juror individually, "is this your verdict?" and "Is it the verdict of the entire jury?" RP at 1581-83. Each juror answered both questions "yes." RP at 1581-83. Defense counsel later argued that a conviction for both second degree murder and first degree manslaughter would violate double jeopardy. Consequently, the trial court dismissed the first degree manslaughter charge.

11

*4. Sentencing*

The trial court sentenced Mr. Alden to a total of 231 months in prison for second degree murder. During the sentencing hearing, Mr. Alden sought an exceptional downward sentence based on (1) Mr. Maks being a willing participant, and (2) Mr. Alden's failed self-defense claim. The trial court denied the exceptional downward sentence, and explained:

> The problem that I had with Mr. Alden's testimony is that even his three friends who testified, who I felt were intelligent, who I felt did what they could to help their friend, did not exaggerate when it came to the important moment, and that is Mr. Alden came around the corner, went up and shot Mr. Maks, period. No hesitation. No jumping.

RP at 1562. The court further noted:

> But the concern that the Court has is that sentencing Mr. Alden, no matter how or what kind of life that Mr. Alden has led up to this particular point, sentencing him below the standard sentencing range would rightfully be offensive to Mr. Maks' parents and family and friends, and clearly his daughters. I think sentencing Mr. Alden below the standard range would be offensive to the jury's struggle in this particular matter.

RP at 1563. As it indicated, the trial court sentenced Mr. Alden within the standard range.

Mr. Alden appeals.

12

## ANALYSIS

A. *Jury Unanimity*

Under the Washington Constitution, a unanimous jury verdict is required in all criminal trials. *State v. Stephens*, 93 Wn.2d 186, 190, 607 P.2d 304 (1980); *see* CONST. art. I, § 22. Reversal of a conviction may be warranted "where the jury were never told that the concurrence of all 12 of them was essential to a verdict." *State v. Badda*, 63 Wn.2d 176, 182, 385 P.2d 859 (1963). "[T]he right to a unanimous verdict is a fundamental constitutional right and may, therefore, be raised for the first time on appeal." *State v. Holland*, 77 Wn. App. 420, 424, 891 P.2d 49 (1995); *see State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014) (RAP 2.5(a) analysis). Constitutional issues are reviewed de novo. *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012).

"'Juries are presumed to follow instructions absent evidence to the contrary.'" *Lamar*, 180 Wn.2d at 586 (quoting *State v. Dye*, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013)). When the jury is given an appropriate unanimity instruction, jury unanimity may be presumed. *See State v. Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988). Further, "[p]olling a jury, when properly carried out, is generally evidence of jury unanimity." *Lamar*, 180 Wn.2d at 587; *accord Badda*, 63 Wn.2d at 182 (the record must be sufficient

13

to determine unanimity based on "the questions asked and the answers given in the poll of the jury").

In *Stephens*, the Supreme Court of Washington reversed a conviction when the defendant was charged with only one count of assault against two victims conjunctively, but the jury instruction listed the names of the victims disjunctively. *Stephens*, 93 Wn.2d at 189-90. The defendant was charged with one count of assault after he fired a shotgun into the front of a car the two victims were near. *Id.* at 188. After the jury returned a guilty verdict, the court held that the instruction violated jury unanimity as it "allowed conviction if, *e.g.*, six jurors believed [the defendant] assaulted [the first victim] and six believed he assaulted [the second victim]." *Id.* at 190. The court noted that the jury instruction "in effect, split the action into two separate crimes (assault against [the first victim] and assault against [the second victim]), while the information charged only one." *Id.*

In *State v. Russell*, the Supreme Court of Washington held a verdict form that failed to distinguish between the alternative means of committing second degree murder (either intentional murder or felony murder) violated jury unanimity. *State v. Russell*, 101 Wn.2d 349, 353-54, 678 P.2d 332 (1984). The defendant's first trial included an intentional second degree murder charge and resulted in a hung jury. *Id.* at 352. Right

14

before the retrial, the prosecution was allowed to amend the information and add felony

murder as an alternative means of committing second degree murder. *Id.* The court

partially held that "[f]ailure to join second degree felony murder in the original

information precludes its inclusion for the first time by way of amendment in the second

trial." *Id.* at 353. Notably, the jury was only provided one verdict form that "did not

distinguish between second degree felony murder and intentional second degree murder."

*Id.* at 354. The court held that the jury unanimity was violated because the single verdict

form makes it "impossible to know whether the jury determined unanimously that the

crime of intentional second degree murder had been committed or whether they

determined unanimously that the 'alternative' crime, improperly charged, had been

proven." *Id.*

Mr. Alden argues that this is a situation of jury confusion as evidenced by the note

sent by the jury to the trial judge. In *Fisher*, a similar note indicating jury confusion was

sent by the jury to the trial judge. *State v. Fisher*, 165 Wn.2d 727, 756 n.7, 202 P.3d 937

(2009). The *Fisher* court stated that although the note shows that the jury was confused

by the prosecutor's charging decisions, "the note does not necessarily demonstrate that

the jury did not understand its instruction to find [the defendant] guilty beyond a

15

reasonable doubt in unanimity." *Id.* Consequently, "[r]ead in conjunction," the jury

instructions sufficiently protected the defendant's right to jury unanimity. *Id.* at 756.

Here, Mr. Alden's jury was instructed multiple times regarding unanimity.

Additionally, jury instruction 22 explained, "[b]ecause this is a criminal case, each of you

must agree for you to return a verdict. When all of you have so agreed, fill in the verdict

forms to express your decision." CP at 329. "'Juries are presumed to follow instructions

absent evidence to the contrary.'" *Lamar*, 180 Wn.2d at 586 (quoting *Dye*, 178 Wn.2d at

556). Although the trial court used the term "verdict" instead of "verdicts" when

conducting the jury poll, this is further proof of jury unanimity, especially when read in

conjunction with the jury instructions and separate second degree murder verdict form.

*See Lamar*, 180 Wn.2d at 586.

Based on the unanimity instruction, this is not a situation where any less than all 12

jurors thought they were finding Mr. Alden guilty of second degree murder when they

returned the separate second degree murder verdict form. *See Russell*, 101 Wn.2d at 354.

Although a conviction for both second degree murder and first degree manslaughter may

violate double jeopardy, jury unanimity is a separate and distinct concept. *See State v.*

*Borsheim*, 140 Wn. App. 357, 366, 165 P.3d 417 (2007) (noting that the argument

"implicates [the defendant's] right to be free from double jeopardy, as opposed to the

16

right to juror unanimity"). We conclude that the jury instructions, especially when coupled with polling of the jury, sufficiently show that Mr. Alden was convicted by a unanimous jury.

B.   *Res Gestae*

Washington courts have recognized that "res gestae" or "same transaction" evidence may be admissible "'[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (internal quotations marks omitted) (quoting *State v. Tharp*, 27 Wn. App. 198, 204, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)). To be admissible under the res gestae doctrine, each incident must be "a piece in the mosaic necessarily admitted in order that a complete picture be depicted for the jury." *Tharp*, 96 Wn.2d at 594.

This court reviews a trial court's evidentiary rulings for an abuse of discretion. *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012). "A trial court abuses its discretion when it exercises it on untenable grounds or for untenable reasons." *Id.* Untenable grounds or untenable reasons exist where the trial court relied on facts unsupported in the record, applied the wrong legal standard, or adopted a view "'that no reasonable person would take.'" *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638

17

(2003) (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)).

However, this court "can affirm the trial court's rulings on any grounds the record and the

law support." *Grier*, 168 Wn. App. at 644.

Washington courts have allowed the prosecution to admit res gestae evidence as an

exception to the requirements of ER 404(b) that "'[e]vidence of other crimes, wrongs, or

acts [is not admissible] to prove the character of a person in order to show action in

conformity therewith.'" *Grier*, 168 Wn. App. at 646 (some alternation in original).

However, res gestae is not simply an exception to ER 404(b); but rather, is a

conglomerate of relevancy and its limits. *See Grier*, 168 Wn. App. at 645-46. In other

words, "[e]vidence that completes the story of the crime ('res gestae' evidence) is also

evidence that pertains to the existence of facts that are of consequence to the crime

('relevant' evidence)." *Id.* at 648 n.28; *see* ER 401. Consequently, the probative value of

res gestae evidence must still substantially outweigh its prejudicial effect under ER 403.

*See Grier*, 168 Wn. App. at 649.

In *Grier*, Division Two of this court held that testimony about the defendant

"brandishing a gun and acting belligerently" the night of a shooting was relevant and

admissible because it foreshadowed the shooting later that evening. *Id.* at 648. Division

18

Two reasoned that the trial court did not abuse its discretion by admitting evidence relating to the events earlier that evening:

> [The defendant's] threatening behavior on the night of the murder was admissible as "res gestae" evidence, (1) not only because it arguably might have fallen under an ER 404(b) exception, but (2) also because it was evidence of the continuing events leading to the murder, relevant under ER 401, and, thus, not "prior misconduct" of the type generally inadmissible under ER 404(b).

*Id.* at 647. The evidence passed ER 403 based on its probative nature, as it provided the jury with a complete picture of the events that night and contradicted the defendant's self-defense claim. *See id.* at 649.

Similarly, in *Thompson*, Division One of this court held that in a self-defense case, res gestae evidence of the defendant's aggressive conduct leading up to shooting two men in a parking lot was admissible. *See State v. Thompson*, 47 Wn. App. 1, 2-4, 733 P.2d 584 (1987). At trial, the defendant unsuccessfully claimed self-defense, and a witness for the prosecution testified that he stumbled on part of the altercation and the defendant pointed a gun at him. *Id.* at 3-4. In addition to reasoning that the evidence passed the ER 403 balancing test, the court noted that the res gestae testimony "was relevant to show the absence of self-defense by showing a continuing course of provocative conduct" that culminated in the shootings. *Thompson*, 47 Wn. App. at 12.

19

Although Washington precedent allows the prosecution to use res gestae evidence to disprove self-defense by the defendant, the law is unclear whether the defendant can use res gestae evidence of the victim's conduct to establish that the victim was the first aggressor. Admissibility of evidence concerning the victim in a self-defense case depends on the purpose for which the evidence is offered. If known to the defendant, the victim's reputation is relevant to prove the reasonableness of the defendant's apprehension at the time of the slaying. *See State v. Adamo*, 120 Wash. 268, 270-71, 207 P. 7 (1922). However, if the defendant did not know of the victim's reputation, the evidence would be irrelevant to show the defendant's state of mind at the time of the incident in question. *See State v. Callahan*, 87 Wn. App. 925, 934, 943 P.2d 676 (1997).

However, this does not explain the ER 404(b) "other acts" evidence exception that the res gestae doctrine mostly relies on now. *See Grier*, 168 Wn. App. at 647. In addition to showing the reasonableness of the defendant's apprehension in a self-defense scenario, evidence may also be relevant to show that the victim was the aggressor. *See Callahan*, 87 Wn. App. at 934 ("A victim's reputation for violence is admissible when the defendant alleges self-defense and shows that knowledge of the victim's reputation for violence contributed to his apprehension. . . . This evidence is also admissible to support the inference that the victim was the aggressor."); *see also State v. Alexander*, 52 Wn. App.

20

897, 900, 765 P.2d 321 (1988) ("As evidence that [the victim] was the first aggressor, [the defendant] offered the testimony of two witnesses concerning specific acts of violence by [the victim]. This evidence is relevant to the first aggressor issue in that it tends to show [the victim] had a violent disposition."). Under the res gestae doctrine, evidence that paints the whole picture of what happened to the jury may be relevant, and is not a prior bad act under ER 404(b). *See Grier*, 168 Wn. App. at 645-48. Consequently, if a defendant has sufficiently raised self-defense, res gestae evidence even unknown by the defendant may be relevant to show that the victim was the first aggressor. *See Thompson*, 47 Wn. App. at 12 (in a prosecution, res gestae testimony "was relevant to show the absence of self-defense by showing a continuing course of provocative conduct" by the defendant).

Here, Mr. Alden sought to admit res gestae evidence that Mr. Maks had acted erratically and aggressively at both a convenience store and a bar. Although Mr. Alden did not know about either of these events at the time of the murder, his trial attorney argued that it was relevant to show Mr. Maks' behavior, and not his character, in the 12 hours before the shooting. Such evidence may have had only slight probative value, but it was relevant to provide the jury with the whole picture of what happened. *See Grier*, 168 Wn. App. at 648 n.28 ("Evidence that completes the story of the crime ('res gestae'

21

evidence) is also evidence that pertains to the existence of facts that are of consequence to the crime ('relevant' evidence)."). It therefore should have been subjected to an ER 403 analysis. However, the trial court denied Mr. Alden's motion, stating "I don't think that this is a case where *res gestae* is relevant to the jury determining what happened at the particular time and the particular incident that . . . happened." RP at 113.

Assuming arguendo that the trial court erred by holding that the evidence was irrelevant and not subject to the ER 403 analysis, such error was harmless. "'A harmless error is an error which is *trivial*, or *formal*, or *merely academic*, and was not prejudicial to the substantial rights of the party assigning it, and *in no way affected the final outcome of the case*.'" *Stephens*, 93 Wn.2d at 190 (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)). In other words, an error is harmless if the outcome of the trial was not affected "'within reasonable probabilities.'"[3] *Grier*, 168 Wn. App. at 651-52 (quoting *Tharp*, 96 Wn.2d at 599).

---

[3] Mr. Alden argues that this court should use the constitutional harmless error test because he has a constitutional right to use deadly force to defend himself. "Constitutional errors cannot be deemed harmless unless they are 'harmless beyond a reasonable doubt.'" *State v. McCullum*, 98 Wn.2d 484, 497, 656 P.2d 1064 (1983) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). However, "[g]enerally evidentiary errors are not of constitutional magnitude." *Grier*, 168 Wn. App. at 643 n.16 (discussing nonpreserved evidentiary errors under RAP 2.5(a)). Further, since the jury was instructed on self-defense, Mr. Alden was not denied the right to use deadly force to protect himself.

Here, the jury heard ample evidence concerning Mr. Maks' belligerent and aggressive conduct in the 12 hours preceding the murder. Mr. Alden testified that Mr. Maks acted in a bizarre and aggressive manner when Mr. Maks tried to buy Adderall from him. The jury also heard testimony that an intoxicated and aggressive Mr. Maks entered the group's vacation home, armed with a pistol, and assaulted members of the group. The jury even heard that Mr. Maks told Mr. Alden "'I'm going to chop your dick off and feed it to my dog.'" RP at 1103. Based on the testimony that was already presented, the outcome of the trial would not have been affected "within reasonable probabilities" if the jury were able to hear evidence that Mr. Maks also caused a disturbance at a convenience store and a bar. Moreover, even if the evidence was relevant, it could have been properly excluded under ER 403 as overly cumulative. We conclude that res gestae evidence of Mr. Maks' aggressive actions unknown to Mr. Alden was relevant, but its exclusion was harmless error either because it probably did not affect the verdict, or because it was excludable under ER 403 as cumulative evidence.

C.  *Reputation Evidence*

The defendant is entitled to introduce reputation evidence of a character trait pertinent to rebut the nature of the charge against him or her. ER 404(a)(1). When intent

23

is an essential element of an offense, evidence of peacefulness may be relevant and admissible. *State v. Eakins*, 127 Wn.2d 490, 495, 902 P.2d 1236 (1995).

"In order to offer reputation testimony, a witness must lay a foundation establishing that the subject's reputation is based on perceptions in the community." *State v. Binh Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005). In other words, such testimony must be based on "personal knowledge of the victim's reputation in a relevant community during a relevant time period." *Callahan*, 87 Wn. App. at 934. The party seeking to admit evidence must establish a foundation for it. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). Determining whether the foundation is adequate is a matter of trial court discretion. *Id.*

"[A] valid community must be 'neutral enough [and] generalized enough to be classed as a community.'" *Thach*, 126 Wn. App. at 315 (internal quotation marks omitted) (quoting *State v. Lord*, 117 Wn.2d 829, 874, 822 P.2d 177 (1991)). "Some relevant factors might include the frequency of contact between members of the community, the amount of time a person is known in the community, the role a person plays in the community, and the number of people in the community." *Land*, 121 Wn.2d at 500. In *Callahan*, the court held that the defendant should have been allowed to introduce testimony regarding his own reputation for peacefulness among his co-workers

24

"at a plant that employed over 1,100 people." *Callahan*, 87 Wn. App. at 936. However, in *Thach* the court held that the trial court properly excluded testimony regarding the defendant's good reputation within his own family, as the family did not constitute a neutral and generalized community. *Thach*, 126 Wn. App. at 315.

Here, Mr. Alden sought to admit evidence of his reputation for peacefulness among his group of friends. The trial court determined that a neutral and generalized community (i.e., the evidence foundation) had not been established as "everybody has a friend." RP at 191. Mr. Alden had the burden of showing that his character witnesses were part of a neutral and general community. *Land*, 121 Wn.2d at 500. The community can be small—consisting, for example, of "close-knit" business associates. *Id.*; *see State v. Carol M.D.*, 89 Wn. App. 77, 95, 948 P.2d 837 (1997), *withdrawn in part on other grounds*, 97 Wn. App. 355, 983 P.2d 1165 (1999) (boy scouts). But where the community consists solely of Mr. Alden's friends, we conclude the trial court acted well within its discretion in determining an adequate foundation had not been established.

D.    *State's Burden of Proving Absence of Defense*

Mr. Alden argues errors in the jury instructions warrant reversal of his conviction. First, in his opening brief he argues that the "to convict" jury instruction for second degree murder omits the absence of the self-defense element. Second, in his reply brief

he argues that the "to convict" second degree murder instruction and self-defense instruction are impermissibly inconsistent. However, both of these portions of the jury instructions matched his proposed jury instructions.

When a defendant proposes an instruction identical to an instruction he later challenges on appeal, the invited error doctrine bars review. *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999). "A party may not request an instruction and later complain on appeal that the requested instruction was given." *State v. Boyer*, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979). Under the doctrine, "even where constitutional rights are involved, [appellate courts] are precluded from reviewing jury instructions when the defendant has proposed an instruction or agreed to its wording." *State v. Winings*, 126 Wn. App. 75, 89, 107 P.3d 141 (2005).

Here, Mr. Alden's proposed jury instructions specifically left out the self-defense language from the "to convict" instruction for second degree murder, and instead included a separate self-defense instruction. Therefore, Mr. Alden invited instructional error, and this court is precluded from reviewing this issue.

E.    *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to effective

26

assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient, and (2) the performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to the claim. *Id.* at 700; *accord State v. Garcia*, 57 Wn. App. 927, 932, 791 P.2d 244 (1990). This court reviews ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To establish deficient performance, the defendant must show that trial counsel's performance fell "below an objective standard of reasonableness based on a consideration of all the circumstances." *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). In reviewing ineffective assistance of counsel claims, this court begins with "a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To rebut this presumption, a defendant bears the burden of establishing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

27

"The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Lawyers often fail to object during closing arguments, "'absent egregious misstatements.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993)). Therefore, failing to object during closing is generally "within the wide range of permissible professional legal conduct." *Davis*, 152 Wn.2d at 717. "Only in egregious circumstances . . . will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763.

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006)). Improper comments are considered in the context of the entirety of the argument, the issues in the case, the evidence, and the court's instructions. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

In the context of Mr. Alden's self-defense claim for the second degree murder charge, the State bears the burden of proving the absence of self-defense beyond a reasonable doubt. *See State v. McCullum*, 98 Wn.2d 484, 490, 656 P.2d 1064 (1983); *accord State v. Walden*, 131 Wn.2d 469, 473-74, 932 P.2d 1237 (1997). This is so

28

because the "lawfulness" element of self-defense negates the intent element of second degree murder. *See McCullum*, 98 Wn.2d at 495.

Here, the State argued during closing:

> When you read the jury instruction on self-defense, the language is important, and that would be Instruction number 15. And I say there's three elements, we've numbered them 1, 2, and 3, but when you read them you'll see that they're separated by the term and. Not the term or, the term and, which means that all three must be satisfied in order for you to return a not guilty verdict by reason of self-defense. The State does bear the burden of showing that there's insufficient evidence to support that, and the State gladly bears that burden.

RP at 1386. Although the State's remarks did not specifically say that the State must prove the absence of self-defense beyond a reasonable doubt, the statement was not an egregious and obvious misstatement of the law when read in conjunction with the jury instruction that the State must prove the absence of self-defense beyond a reasonable doubt. Therefore, Mr. Alden has not established deficient performance as "[a] decision not to object during summation is within the wide range of permissible professional legal conduct." *Davis*, 152 Wn.2d at 717.

Moreover, even if trial counsel's failure to object was deficient, Mr. Alden cannot show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As mentioned above, the jury was instructed that the prosecution had the burden of proving the absence of self-defense

29

beyond a reasonable doubt. "'Juries are presumed to follow instructions absent evidence

to the contrary.'" *Lamar*, 180 Wn.2d at 586 (quoting *Dye*, 178 Wn.2d at 556). We

conclude that Mr. Alden's claim of ineffective assistance of counsel fails.

F.   *Exceptional Downward Sentence*

"Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, a trial

court must generally impose a sentence within the statutory standard range." *State v.*

*Ramos*, 189 Wn. App. 431, 357 P.3d 680 (2015). "The court *may* impose a sentence

outside the standard sentence range for an offense if it finds, considering the purpose of

this chapter, that there are substantial and compelling reasons justifying an exceptional

sentence." RCW 9.94A.535 (emphasis added). Pursuant to RCW 9.94A.535(1):

> The court may impose an exceptional sentence below the standard
> range if it finds that mitigating circumstances are established by a
> preponderance of the evidence. The following are illustrative only and are
> not intended to be exclusive reasons for exceptional sentences.
>     (a) To a significant degree, the victim was an initiator, willing
> participant, aggressor, or provoker of the incident.
>     . . . .
>     (c) The defendant committed the crime under duress, coercion,
> threat, or compulsion insufficient to constitute a complete defense but
> which significantly affected his or her conduct.

Generally, a party cannot appeal a trial court's refusal to impose an exceptional

sentence that necessarily results in a standard range sentence. *State v. Friederich-Tibbets*,

123 Wn.2d 250, 252, 866 P.2d 1257 (1994); *see* RCW 9.94A.585(1). "A trial court's

decision regarding the length of a sentence within the standard range is not appealable because 'as a matter of law there can be no abuse of discretion.'" *State v. Mail*, 121 Wn.2d 707, 710, 854 P.2d 1042 (1993) (quoting *State v. Ammons*, 105 Wn.2d 175, 183, 713 P.2d 719, 718 P.2d 796 (1986)). However, a party may "challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003). "[W]here a defendant has requested an exceptional sentence below the standard range: review is limited to circumstances where the court has refused to exercise its discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). Under such circumstances, it is the trial court's refusal to exercise discretion that is appealable, not the sentence. *Id.*

"A court refuses to exercise its discretion if it refuses categorically to impose an exceptional sentence below the standard range under any circumstances; i.e., it takes the position that it will never impose a sentence below the standard range." *Id.* A court relies on an impermissible basis when declining to impose an exceptional sentence below the standard range if, for example, it takes the position that no drug dealer should get an

31

exceptional sentence down or it refuses to consider the request because of the defendant's race, sex, or religion. *Id.*

In *Cole*, the defendant unsuccessfully requested a below range sentence and then challenged the court's refusal to impose an exceptional sentence on appeal. *State v. Cole*, 117 Wn. App. 870, 881, 73 P.3d 411 (2003). The court held that the defendant could not appeal from a standard range sentence where the trial court "considered [the defendant's] request for application of a mitigating factor, heard extensive argument on the subject, and then exercised its discretion by denying the request." *Id.* Similarly, in *Garcia-Martinez*, involving an equal protection challenge to a standard range sentence, the court held that a trial court that has considered the facts and concluded no basis exists for an exceptional sentence has exercised its discretion and the defendant may not appeal that ruling. *Garcia-Martinez*, 88 Wn. App. at 330.

Here, Mr. Alden requested an exceptional downward sentence based on both Mr. Maks' being a willing participant, and his failed self-defense claim. The trial court rejected the exceptional downward sentence, and sentenced Mr. Alden to 231 months in prison, pursuant to the standardized sentencing guidelines. The trial court explained its refusal was partly due to the lack of evidence of self-defense. Its refusal also was due to its belief that imposing an exceptional sentence downward would be offensive to both

32

Mr. Maks' friends and family, and also the jury, which rejected the self-defense claim. The court considered Mr. Alden's argument, stated that it found the evidence did not support the mitigating factors based on the testimony at trial, and then exercised its discretion by denying Mr. Alden's request for an exceptional sentence downward. Contrary to Mr. Alden's assertion on appeal, although the trial court expressed concern for Mr. Maks' family and the jury in imposing the standard sentence, it did not delegate its discretion to Mr. Maks' family or the jury. "Without an adequate factual or legal basis to permit it to step outside the standard range, the trial court decided it could not impose a sentence other than one within the standard range. This is an appropriate exercise of sentencing discretion." *Id.* at 331. Since the record does not show an abuse of discretion, this court is precluded from considering this issue on appeal.[4]

---

[4] Mr. Alden submitted a supplemental brief arguing that a recent Supreme Court of Washington case, *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), warrants sentencing remand so the trial court may consider Mr. Alden's youthfulness when he committed the crime. In a five-to-four decision, the *O'Dell* court held that "a trial court must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender like [Mr.] O'Dell, who committed his offense just a few days after he turned 18." *Id.* at 696. The *O'Dell* majority reasoned that categorically refusing to consider youth as a mitigating factor does not take into account the "impulsivity, poor judgment, and susceptibility to outside influences . . . *of specific individuals.*" *Id.* at 691 (emphasis added).

The defendant in *O'Dell* was barely over 18 when he committed the crime. *See id.* at 696. Here, Mr. Alden was 23 years old when he shot Mr. Maks. During the sentencing hearing, multiple individuals testified about Mr. Alden's maturity and academic drive.

33

No. 32695-1-III
*State v. Alden*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.                    Fearing, J.

Therefore, even if retroactivity analysis applied, the holding in *O'Dell* does not apply to
Mr. Alden. *See id.* at 691-96.